[Crim. No. 32493. Second Dist., Div. Five. Mar. 16, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS CECIL SUTTLE et al., Defendants and Appellants.

## Counsel

Richard H. Levin and Anthony J. Despol, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**STEPHENS, J.**—Appellants Levi Carter and Louis Cecil Suttle were charged jointly with the following crimes as contained in a four-count information filed on October 5, 1977: count I, robbery, in violation of section 211 of the Penal Code,[1] including an allegation that in the commission of the offense a principal was armed with a firearm within the meaning of section 12022, subdivision (a); count II, grand theft, in violation of section 487, subdivision (3); count III, felony joyriding, in violation of section 10851 of the Vehicle Code; count IV, receiving stolen property, in violation of section 496. In addition, appellant Suttle was

---

[1]Unless otherwise specified, all statutory references are to the Penal Code.

charged in relation to count I with personally using a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). Both appellants Carter and Suttle pled not guilty to all charges and were tried before a jury. On January 20, 1978, the jury returned not guilty verdicts as to counts II and IV, grand theft and receiving stolen property, respectively, and guilty verdicts as to counts I, robbery, and count III, felony joyriding. In addition, the jury found that the armed and use allegations were true as to Suttle and that the armed principal allegation was true as to Carter. These appeals followed.

The salient facts that gave rise to the charges against appellants are as follows: On August 31, 1977, Doctor Ronald P. Barlow returned to the parking lot at Wilshire Boulevard and Serrano Avenue to find that his silver Honda Accord, license No. RPB MD, was missing from the lot.

The following day, September 1, appellants and a third man entered The Hardware Store in Brentwood, a jewelry store. The manager of the store, Judy Lanksford, was on the telephone when Carter entered the store initially. Following her phone conversation, Ms. Lanksford wrote up a jewelry repair for another customer, Lynne Levinson, who entered the store after Carter. Levinson left. Carter then asked Lanksford to take out a diamond ring from one of the display cases. After she handed it to him, Suttle pulled out a gun and told Lanksford to open the other display cases and the cash register. She was then ordered to move back and squat down on the floor and the third robber, who was not apprehended, pushed her to the floor and held a gun at her head. Meanwhile, Carter and Suttle took various pieces of jewelry out of the cases. Suttle took Lanksford's purse and gave it to Carter to put the jewelry in. Carter and Suttle left the store, followed by the third man. They ran from the store and drove away. In the meantime, Michael Jensen, a part-time jeweler for The Hardware Store, had started down the stairs from his repair shop while the robbery was in progress. Seeing that something was awry, he went back upstairs to get his gun, but by the time he returned the robbers were rounding the corner to the west of the store and making their getaway. Jensen then enlisted the assistance of a neighbor and his automobile to pursue the fleeing robbers. They drove to Sunset Boulevard and proceeded east to the San Diego freeway. As they approached the freeway, Jensen saw a silverish Honda Accord, the last two letters of the license plate being "MD." They got on the San Diego freeway in pursuit, but lost sight of the car in traffic after about three-quarters of a mile.

Both Carter and Suttle were apprehended later that day as they attempted to elude police in a residential neighborhood after being spotted in the distinctive Honda. Carter was found lying on his stomach in some bushes at 340 West 57th Street. Suttle was apprehended inside a residence at 222 West 58th Street. The Honda Accord, license No. RPB MD, was found parked across the lawn at 338 West 54th Street. When apprehended, Carter was wearing a watch that was identified as having come from The Hardware Store robbery. A red leather purse identified as belonging to Judy Lanksford was found on October 13, 1977, under a house at 335 West 55th Street by a small child looking for his dog. In it was a key for room 18 of the Twenty-Four Hour Motel to which appellants had been linked on the day of the robbery by virtue of the motel registration for that room containing the RPB MD license number, a designation that the car driven was a Honda, and the fingerprints of Suttle.[2] In addition, a fingerprint of Carter's was found on a cigar package that was in the Honda when it was impounded following the arrests.

Appellants were initially taken to the Newton division police station and later transferred to the West Los Angeles police station, where they were fingerprinted. Appellants were placed in separate special cells, separated by a two or three foot corridor, and equipped with a hidden listening device connected to a tape recorder. At trial, portions of the tape recording made of the conversation between appellants as they sat in their cells was admitted into evidence over objection by Suttle's defense attorney. It contained a statement by Carter about ditching a piece of the stolen jewelry. In addition, Carter had requested that he be allowed to call his mother. A portable phone was wheeled outside his cell for this purpose. His side of the conversation was also monitored by the listening device and the tape admitted into evidence at trial. This tape consisted of Carter attempting to get his mother to change[3] her story, with Suttle volunteering information in the background, regarding their activities that morning.

On the day following the robbery, Judy Lanksford was requested to come to the West Los Angeles police station in order to view a photo

---

[2] When appellant Suttle was originally booked, made a statement and was fingerprinted, he used the name "James Williams." It was the prints of "James Williams" that were found on the motel registration. However, it was later confirmed that Williams was in fact appellant Suttle.

[3] While appellants were at the Newton station, a call was placed to Carter's mother by police officers. They advised her that her son was in custody. She stated that two men had come by the house that morning in a small silver car and had spoken with Carter. This information was then relayed to Carter.

lineup. She was presented with three sets of six pictures each and identified both Carter and Suttle in the first group of six.

On their appeals, appellants jointly contend that:

█ (1) The monitoring and recording of the conversation between them and of Carter's side of his conversation with his mother violated their reasonable expectations of privacy and therefore constituted an illegal search and seizure within the meaning of the Fourth Amendment.

(2) The monitoring and recording of Carter's side of his conversation with his mother violated the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520).

Appellant Carter also contends that:

█ (3) The failure to provide Carter counsel at the photo lineup procedure violated his Sixth Amendment right to counsel;

█ (4) The prosecution should have been required to conduct a corporeal lineup since Carter was already in custody;

(5) The identification procedure employed was so highly suggestive that there was a substantial likelihood of misidentification.

### The Jailhouse Conversations

█ In assessing appellants claim that their Fourth Amendment rights were violated by the monitoring of their jail cell and taping of their conversations (including Carter's side of the conversation with his mother), we begin with the well-established proposition that there is no reasonable expectation of privacy in a jail cell. (*People* v. *Boulad* (1965) 235 Cal.App.2d 118, 126 [45 Cal.Rptr. 104] and cases cited therein; *United States* v. *Hitchcock* (9th Cir. 1972) 467 F.2d 1107.) Appellants, however, rely on *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155] in an attempt to fit their case within an exception to the above rule.

In part, the exceptions that have developed in regard to the lack of a reasonable expectation of privacy in jailhouses "focus upon the special relationship between the communicants." (*North* v. *Superior Court, supra,* at p. 309.) This is recognized by statute in Penal Code section 636, which

makes it a felony to eavesdrop upon or record a conversation between a person in custody and his attorney, religious advisor or licensed physician. Further, in *North,* the California Supreme Court recognized that an incarcerated person *could* have a reasonable expectation of privacy under certain circumstances. However, that prisoner North had such an expectation was based upon the police officers' "deliberate attempt to *create* an expectation of privacy . . . ." (*People* v. *Hill* (1974) 12 Cal.3d 731, 764-765 [117 Cal.Rptr. 393, 528 P.2d 1]. Italics in original.) Therefore, in *Hill,* the court allowed the tape recording made of a conversation between the defendant and his wife, saying that "[i]n the instant case the record discloses no evidence whatsoever that officers created an expectation or belief that the . . . conversation would be private." (*Id.,* at p. 765.)

Here appellants were placed in adjacent cells, all police personnel seemingly out of earshot. This is a far cry from the situation in *North* where an office was given over to a prisoner and his wife by a detective who then withdrew ostensibly solely so that the parties could converse in private. As the court observed in *People* v. *Finchum* (1973) 33 Cal.App.3d 787, 791 [109 Cal.Rptr. 319], under circumstances similar to our case, "Hope would be the *most* that anyone in such a situation could have had, and hope falls far short of what the law recognizes as a reasonable expectation." (Italics in original.)

Appellants also specifically attack introduction of the taped conversation Carter had with his mother on the ground that such recording violates the Omnibus Crime Control and Safe Streets Act of 1968. (18 U.S.C. §§ 2510-2520.) Without going into detail regarding this federal legislative scheme, appellants' contentions are answered in *United States* v. *McLeod* (7th Cir. 1974) 493 F.2d 1186 and the companion cases of *United States* v. *Carroll* (D.C. 1971) 332 F.Supp. 1299, and *United States* v. *Carroll* (D.C. 1971) 337 F.Supp. 1260.)

In the first cited *United States* v. *Carroll, supra,* the district court stated (at p. 1301) that it was "of the view that the overhearing and recording of one end of a telephone conversation without the actual interception of a communication passing through the wires, was not intended to be included within the definition of the term 'wire communication' but under the statute is simply another form of oral communication." Therefore, the motion to dismiss those charges based upon the unlawful

interception of a wire communication was granted.[4] Then, in a later adjudication of Carroll's culpability for violation of the oral communication aspect of section 2511(1)(a),[5] the same court recognized that a necessary component to this charge was that the speaker whose conversation was overheard and recorded entertained a reasonable expectation of privacy. (18 U.S.C. § 2510(2); *United States* v. *Carroll, supra,* 337 F.Supp. 1260, 1262.) Since it was found in that case that he did not, the defendant's motion to dismiss the indictment was granted. (*Id.,* at p. 1264.)

In the present case we have already established that appellants had no reasonable expectation of privacy in their jail cells. This applies as much to Carter's half of his telephone conversation with his mother as to the conversation between Carter and Suttle. It is clear that one half of a telephone conversation is an "oral communication" as opposed to a "wire communication." Although the speaker's voice is carried over the telephone wire, it also escapes into the area surrounding the speaker for some distance and can be overheard without resort to interception of it over the wire. Therefore, the requirement that the speaker exhibit the same reasonable expectation of privacy when communicating orally person to person or when speaking over a telephone is entirely consistent. The same standard should apply whether the person overheard is speaking directly to another person or into a device. Under this reasoning, there is no merit in the contention that appellants were "lulled into believing that [the] conversation would be confidential" (*North* v. *Superior Court, supra,* 8 Cal.3d 301, 311) between Carter and his mother. The argument on appeal however is that when Carter asked the jailor if

[4]Section 2510 of the United States Code contains the following definitions:

"(1) 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

"(2) 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;

". . . . . . . . . . . . . . . . . . .

"(4) 'intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device."

[5]Section 2511 (1)(a), of the United States Code provides in part as follows:

"(1) Except as otherwise specifically provided in this chapter any person who—

"(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication; . . . shall be fined no more than $10,000 or imprisoned not more than five years, or both."

the portable pay phone was "bugged" and received a negative answer, Carter reasonably believed the conversation would be private.

It is thus reasonable to assume Carter meant his question to include the "telephone booth"—his cell—as well as the telephone itself. The assurance that there was no bug in the phone, he argues, was misleading, at best. Conceding this to be true and the admission of the tape erroneous, nonetheless the admission of Carter's side of his conversation with his mother does not require reversal, since, in light of the overwhelming evidence of appellants' guilt, admission was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

*The Photo Lineup*—(As to Appellant Carter Only)

Initially, we note that the People have correctly stated that counsel for neither appellant objected to testimony regarding identification by photographic lineup at trial. ■ "Failure to raise the identification issue in the trial court by objection or motion to strike, precludes appellant from asserting the issue on appeal. [Citations.]" (*People* v. *Torres* (1971) 19 Cal.App.3d 724, 732 [97 Cal.Rptr. 139].) However, since the issue can be disposed of easily on the merits, we will do so.

■ Appellant's contention that his counsel should have been present during the photo identification procedure is entirely unmeritorious. "The overwhelming weight of authority . . . holds that counsel's presence is not required when mug shots or other pictures of a suspect already in custody are shown to witnesses. [Citations.]" (*People* v. *Lawrence* (1971) 4 Cal.3d 273, 279 [93 Cal.Rptr. 204, 481 P.2d 212].) ■ Neither do we find the identification procedure to have been so suggestive so as to lead to a substantial likelihood of misidentification. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].) Appellant has pointed out no features of the procedure with which he quarrels. Rather, he goes through the tests formulated in *Neil* v. *Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375] to determine whether the identification of the defendant was reliable, the identification procedure there already having been determined to have been impermissibly suggestive. These criteria are inapplicable in a situation where the pretrial identification procedure is not first shown to be so suggestive as to lead to misidentification.

Appellant does make the novel assertion that a corporeal lineup should have been employed since he was already in custody. He contends that "identification from a still photograph is substantially less reliable than identification of an individual seen in person." (*People* v. *Gould* (1960) 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865].) The Supreme Court in *Gould* cited Wigmore's treatise on Evidence for the quoted proposition. While we do not contradict such a source, it appears to us that the question regarding the reliability of identification procedures has always been whether the particular procedure employed is suggestive on the one hand, or reliable on the other. There is no requirement, constitutional or otherwise, that the *most* reliable technique be used. Here, since the photo identification was not suggestive, we will not go farther by holding that a corporeal lineup should have been used since appellant was in custody and that his constitutional rights were violated because the police failed to do so.[6]

The judgments are affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied April 12, 1979, and the petition of appellant Carter for a hearing by the Supreme Court was denied May 24, 1979.

---

[6]We note that the language from *Gould* regarding the reliability of photographic versus personal identification is in the context of a case where the victim of the crime could not identify the subject of the photograph when she later saw him in person. The court noted that this made the photo identification "particularly suspect." (*People* v. *Gould, supra,* 54 Cal.2d 621, 631.)