688 P.2d 1051

**The STATE of Arizona, Appellee,**

**v.**

**George Michael HAUSS, Appellant.**

**Nos. 2 CA–CR 2850, 2 CA–CR 2851–2.**

Court of Appeals of Arizona,
Division 2.

May 24, 1984.

Review Denied Sept. 25, 1984.

---

Robert K. Corbin, Atty. Gen., by William J. Schafer III and Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by Susan A. Kettlewell, Deputy Public Defender, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant, known as the "foot fetish rapist" was convicted, by a jury, of three counts of second-degree burglary, class 3; one count of aggravated assault, class 6; nine counts of kidnapping, class 2; five counts of sexual abuse, class 5; three

counts of sexual assault, class 2; six counts of first-degree burglary, class 2; and one count of attempted sexual abuse, class 6. Some of the crimes were found to be repetitive and dangerous and he was given aggravated, concurrent sentences on the first group of crimes which range from 1.875 years to 35 years in prison. The sentences on the second group of crimes range as high as 35 years in prison, were concurrent with each other, but consecutive to the sentences imposed for the first group of crimes.

Appellant contends that the trial court erred by (1) admitting into evidence a taped statement between appellant and his girlfriend in violation of appellant's rights under the United States Constitution, the Arizona Constitution and federal law; (2) failing to grant a mistrial when the state referred in closing argument to evidence which had been excluded by the trial court; (3) failing to grant appellant's motion for directed verdict for the failure of the state to prove that appellant was not the spouse of the alleged victims; (4) allowing Lynne Kidd to identify appellant as the perpretator of the assault against her, and (5) denying him a fair trial due to the state's failure to adequately preserve evidence which may have been exculpatory in nature. We affirm.

The record shows that in the early morning hours between December 1980 and September 1981, appellant broke into the homes of ten different female victims in Tucson and terrorized them. His case became widely known as the "foot fetish" case since in almost every instance, as part of the ritual activity, appellant, kissed, fondled and/or masturbated against the victims' feet. He usually used lotion and often put stockings and/or shoes on the women's feet. The weapon used in the dangerous counts was a knife. The victims were bound and gagged, usually with socks or stockings. Only one victim positively identified appellant with a composite drawing, in a photo lineup and in court. Other victim identifications were consistent with appellant's general appearance. Appellant was tied to each of the crimes by various pieces of evidence. For example, he left his tennis shoe footprints outside several of the crime scenes. The footprints were even traced to and from appellant's apartment and the residence of the last victim. Tennis shoes seized from appellant's residence matched these footprints. Also found in appellant's apartment were items taken from the victims' residences including keys, jewelry and stereo equipment. Appellant sold one victim's tape recorder to his co-worker. He sold another victim's rare Russian 100 ruble coin to a coin dealer and signed a receipt for it. He still had a copy of this receipt on him in his possession when he was arrested. Some victims had described their attacker as wearing red shorts with white stripes. Such shorts were seized from appellant's residence. Appellant also left his fingerprints inside or at the points of entry to several of the crime scenes. Hair analysis and analysis of semen stains were consistent with appellant having been the attacker in various cases.

Other facts also tied the incidents together. For example, appellant had disabled the telephone in several of the residences, and usually carried a flashlight to help him rummage around. He invariably asked for food, money and valuables and attempted to disguise his identity by changing his voice, pretending to be unfamiliar with the area, or making derogatory comments about white people. There were also indications that he had watched the victims and knew that they were living alone or with only their minor children or a female roommate. Furthermore, in a conversation which was taped by the police, appellant admitted to his girlfriend that he did touch the feet of these women but denied that he had ever raped any of them.

### THE TAPE RECORDING

Appellant claims that the trial court erred in denying his motion to suppress the tape recording. He asserts three grounds for contending that the tapes should have been suppressed: (1) The conduct of the

state in taping the conversation between himself and his girlfriend violated his right to be free from unreasonable search and seizure and violated his right of privacy; (2) the taping of the conversation violated the Federal Wiretap Law, Ch. 119 of Title 18 of the United States Code and A.R.S. § 13–3005; (3) the taping of the conversation violated his Fifth and Fourteenth Amendment right to remain silent and to be free from self-incrimination, and (4) the taping violated his right to confrontation as guaranteed by the Sixth Amendment to the United States Constitution and Art. 2, § 24 of the Arizona Constitution. We do not agree with any of these contentions.

We view the facts in the light most favorable to the trial court's ruling on a motion to suppress and its ruling will not be disturbed on appeal absent clear and manifest error. *State v. Gerlaugh,* 134 Ariz. 164, 654 P.2d 800 (1982), supplemented 135 Ariz. 89, 659 P.2d 642 (1983). These facts show that after being arrested and transported to the police station, appellant was placed in an interview room. One of the officers, Sergeant Johnson, related some of the evidence against appellant and gave him his *Miranda* warnings. Appellant stated he would discuss the crimes with the police if they would first let him speak with his live-in girlfriend. The police agreed and allowed appellant to telephone her. When she arrived, she was escorted to the interview room. Johnson told her he did not want "any funny business", and did not want her to pass a weapon or anything else to appellant. He told her that the room was being monitored, and she replied either "OK" or "All right". Both of the officers involved testified they were concerned with the passing of a weapon, the discussion of possible escape plans, or plans to destroy evidence. They also testified that there was a possibility that she was involved in the crimes. In fact, there was evidence at trial that she babysat for at least one of the victims.

There was a listening device concealed in the wall of the interview room. This device had been used before, but not on a routine basis. The officers tried to listen to the conversation, and they also had a tape recorder going at the same time. For some mechanical reason they were not able to do so, but the conversation was recorded.

Appellant and his girlfriend were left alone in the room. The tape recording reveals that they whispered during part of their conversation. The reason that they let her talk to appellant in the first place, was that they hoped that appellant would then discuss the case after talking with her as he said he would. The police never expected that he would confess his involvement in these crimes to his girlfriend. When she left, appellant refused to talk and asked for a lawyer. This request was honored.

The trial court, after the hearing on the motion to suppress, found: (1) The girlfriend was aware the conversation would be monitored and impliedly consented to the recording; (2) she was not an agent of the state; (3) there was no government interrogation nor were the statements elicited by a functional equivalent of governmental interrogation nor government conduct; (4) the monitoring was a reasonable means of maintaining security at the police station; (5) any expectation of privacy was outweighed by the need to maintain security; (6) the statements were not obtained in violation of any constitution or statute. We agree with the trial court's conclusions.

The case relied upon by the trial court was *United States v. Hearst,* 563 F.2d 1331 (9th Cir.1977), cert. den. 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). In *Hearst,* a conversation between Patricia Hearst and a friend visiting her in custody two days after her arrest was held admissible over Fourth Amendment objections. The Ninth Circuit, in arriving at its decision, relied on the case of *Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962) and in so doing, rejected the contention that the Supreme Court's decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), effectively overruled *Lanza* or significantly reduced its precedential value.

The *Lanza* case involved an electronic interception of a conversation between a jail prisoner and a visitor, Lanza. Unknown to the two, the jail officials, by means of an electronic device installed in the visitor's room at the jail, had listened to and transcribed the conversation. The transcript of this conversation was then delivered to a state legislative committee which was investigating possible corruption in the state system. Lanza was called before the committee where, after receiving immunity, he refused to answer a series of questions. Because of this refusal, he was convicted of a misdemeanor. He attacked the conviction, charging that the interception of the conversation was violative of Fourth Amendment principles incorporated in the due process clause of the Fourteenth Amendment and that the committee interrogation was based on information that they had derived from the improper interception. In rejecting Lanza's argument, the Supreme Court observed that:

" ... to say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment Protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house' and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." 370 U.S. at 143, 82 S.Ct. at 1220–1221 (footnotes omitted)

Appellant points out that here, contrary to the *Hearst* case, there was never any evidence that there was a practice of monitoring or recording prison/visitor conversations as there was in *Hearst*. While this may be true, it does not mandate a conclusion contrary to the *Hearst* case. The reason that there was no policy established by the evidence in this case, was that the police did not make it a practice to allow visitors at the police station in the interview room. It was allowed in this case because the officers believed that appellant was going to tell them about the crimes if he was given an opportunity to speak to his girlfriend. The focus here should not be, on whether or not there had been an established practice for monitoring the conversation, but rather whether or not the conduct of the officers was reasonable and therefore not violative of the Fourth Amendment. Once the government establishes that its intrusion is for a justifiable purpose of imprisonment or prison security, the Fourth Amendment question is essentially resolved in its favor. *United States v. Hearst*, supra. Without reaching the question of whether or not appellant's girlfriend actually understood that the conversation was going to be listened into, and without considering whether the fact that they were whispering to each other, indicating that appellant also knew that the conversation was being monitored, we hold that the trial court did not err in denying the motion to suppress.[1]

■ 18 U.S.C. § 2511 precludes the admission of evidence if a person "[W]illfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire or oral communication ...." § 2511(1)(a).

18 U.S.C. § 2510 defines wire communication and oral communication as follows:

"(1) 'Wire communication' means any communication made in whole or in part through the use of facilities for the

1. See Annot. "Admissibility, In Criminal Prosecution, of Evidence Obtained by Electronic Surveillance of Prisoner", 57 A.L.R.3d 172 et seq.

transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

(2) 'Oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;"

Appellant contends that the taping of the conversation with his girlfriend violated the foregoing act. We do not agree. It is clear that the tape recording did not constitute a wire communication within the meaning of the act, since it involved no facility furnished or operated by a common carrier. Furthermore, the conversation was outside the statutory definition of "oral communication" since there was no reasonable expectation of privacy in a situation such as this, as we have previously discussed. *People v. Estrada*, 93 Cal. App.3d 76, 155 Cal.Rptr. 731 (1979); *People v. Suttle*, 90 Cal.App.3d 572, 153 Cal.Rptr. 409 (1979).[2]

■ Appellant also contends that the tape recording should not have been admitted into evidence because the officers violated A.R.S. § 13–3005. This statute states in part:

"Except as provided in 13–3012, a person is guilty of a class 5 felony who being:

\*   \*   \*   \*   \*   \*

2. Not present during a conversation or discussion, knowingly and by means of an instrument or device overhears or records such conversation or discussion, or aids, authorizes, employs, procures or permits another to so do, without the consent of a party to such conversation or discussion; \* \* \*"

We do not agree. The rationale of the *Hearst* case applies equally here. There being no reasonable expectation of privacy in the setting which existed, the statute was inapplicable.

■ Contending that appellant's right to remain silent and to be free of self-incrimination is guaranteed by the Fifth and Fourteenth amendments of the United States Constitution and art. 2, § 10 of the Arizona Constitution, it is appellant's position that the taping of his conversation resulted in a violation of these rights. Specifically, he contends that his girlfriend was used by the police as an unwilling agent of the state. We do not agree. The trial court found, and the record supports the conclusion that she was not an agent of the state. There was no interrogation by her and no expectation on the part of the police that he was going to confess to her.

■ Appellant claims that he was denied his Sixth Amendment right to counsel. We do not agree. The arrest and the taping occurred on September 4, 1981. He was not charged with these offenses until September 15. Appellant's Sixth Amendment right to counsel did not arise until he was indicted. *State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020 (1981). Even if his Sixth Amendment rights had attached, appellant would have to show that he was interrogated by the state. *United States v. Hearst*, supra, at 1347–48. This he failed to do.

■ Lastly, appellant claims a violation of his right to confrontation because neither the state nor appellant called the girlfriend at trial. We do not agree. Her statements on the tape were not offered for the truth of any material fact asserted.

---

**2.** This view is also expressed by the legislative history of the act. In its report on Title 3 the Senate Judiciary Committee wrote:

"(2) [of § 2510] defines 'oral communication' to include any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation. The definition is intended to reflect existing law ... [S]uch an expectation would clearly be unjustified in certain areas; for example a jail cell (*Lanza v. New York*, 82 S.Ct. 1218, 370 U.S. 139 [8 L.Ed.2d 384] (1962))." 1968 U.S. Code Congressional and Administrative News, 90th Congress, 2nd Session at 2178.

They were merely offered to show that they were spoken. They were, therefore, neither hearsay nor did their admission constitute a denial of confrontation. See *State v. Nightwine*, 137 Ariz. 499, 671 P.2d 1289, 1292 (App.1983).

## REFERENCE TO EXCLUDED EVIDENCE

■ During the trial the state sought to introduce into evidence not only the tape recording but also the state-prepared transcript of that conversation. The trial court ruled that the transcript of the conversation would not be admitted into evidence.

During her final closing argument to the jury, the prosecutor reminded the jury of the conversation between appellant and his girlfriend by reading portions of it to them. Apparently, she was reading from a copy of the transcript. However, nothing that she read to the jury was anything that the jury could not hear on the tapes.

At the close of the state's argument, counsel for appellant moved for mistrial on the basis that the transcript had been excluded and therefore the prosecutor's reference to it and reliance upon it was improper and prejudicial to appellant. Appellant's motion for mistrial was denied and he now claims that this was error. We do not agree. The trial court, in its ruling, stated that for all the jury knew, Miss Kelly had been reading from her notes, and since the jurors were instructed that statements of counsel were not evidence, there could be no supposition that they would treat her version of the tape as evidence. In any event, appellant has not shown how he could have been prejudiced. .

## FAILING TO DIRECT A VERDICT ON THE SEX CHARGES

■ Appellant argues that the state failed to prove that the eight victims of the sex crimes were not appellant's spouse. A.R.S. § 13–1406 defines sexual assault as "intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person not his or her spouse without consent of such person." A.R.S. § 13–1404 defines sexual abuse as "intentionally or knowingly engaging in sexual contact with any person not his or her spouse without consent of that person ...." The word "spouse" is defined in A.R.S. § 13–1401(4) as "a person who is legally married and cohabiting." Appellant's contention that there was no proof that the victims were not his spouses is entirely devoid of merit. All of the various victims were asked with whom they were living. They either resided alone at the time of the crimes or were living with their minor children or with a female roommate. The evidence also showed that none of the women recognized appellant. Appellant was living in a different location with his girlfriend. The circumstantial evidence here proves that none of the victims were appellant's spouses. Cf. *State v. Rainey*, 137 Ariz. 523, 672 P.2d 188 (App.1983).

## THE IDENTIFICATION OF APPELLANT BY ONE OF THE VICTIMS

Prior to testifying before the jury a hearing was held to determine whether or not the witness' anticipated in-court-identification of the appellant as her attacker was tainted by unduly suggestive pretrial procedures. The trial court ruled that the pretrial procedures were not unduly suggestive and the victim identified appellant in court before the jury as her attacker. Appellant claims that there were two pretrial lineups and that the victim's identification of his photo at the second pretrial lineup was tainted by his picture having been present in the first pretrial photo lineup. He also contends that the victim's in-court-identification was tainted by the fact that when the victim identified appellant at the second photo lineup, the police told her that she had picked the right one. We find that the trial court did not abuse its discretion in ruling that the victim's in-court-identification of appellant was admissible.

■ There was a conflict in the evidence below between the police officer who conducted the pretrial photo lineup and the

victim. The victim was under the impression that there had been two photo lineups. However, the police officer testified that there was only one photo lineup. Assuming, arguendo, that there were two photo lineups, there was no evidence that appellant's picture was even in the first photo lineup. The testimony at the pretrial hearing shows that the victim got a good look at appellant because her bedroom was illuminated by daylight. She had previously constructed a composite drawing following the crimes. She was never told that she had to pick a photo or that there even was a suspect in custody. She was positive of her choice of appellant because appellant had a distinctive "Greek nose" and reminded her of a former teacher. Were the identification procedures otherwise not suggestive, comments as made by the policeman here do not taint an initially fair procedure. *State v. Romero*, 130 Ariz. 142, 634 P.2d 954 (1981). There being no evidence that the identification procedure was not otherwise suggestive, the trial court did not err in its ruling.

### THE FAILURE TO PRESERVE EXCULPATORY EVIDENCE

In the case of four of the victims semen stains obtained from bedding, clothing or vaginal swabs were turned over to the Tucson Police criminologist who conducted tests on them to determine the blood groupings found in the various samples. To this end, samples of blood and saliva were taken from the victims and from appellant after his arrest. The criminologist only determined the blood groupings in the semen stains and swabs and made no effort to conduct an enzyme test to further define the possibility that appellant was or was not a contributor to these stains. This was because of the fact that at that time his laboratory was not equipped to do this test. Furthermore, no effort was made to freeze any of these samples so that they could be later tested when the perpetrator of the crimes was arrested.[3] Prior to trial, appel-

lant made a motion to suppress any evidence of the blood groupings on the grounds of relevancy and that appellant's blood samples and saliva samples were secured from him as a result of unreasonable search and seizure. The trial court rejected both of these contentions and the criminologist was allowed to testify in court. However, the trial court did give a "Willits Instruction" instructing the jury that they could infer from the fact that the police failed to preserve the semen samples and swabs that the evidence which appellant might have been able to adduce may have been unfavorable to the state.

For the first time on appeal, appellant contends that the trial court erred in admitting the blood group sample because it failed to preserve the evidence. See *Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1979) and *Scales v. City of Mesa*, 122 Ariz. 231, 594 P.2d 97 (1979). We hold that this objection was waived since appellant failed to make it one of his grounds for his motion to suppress. Even, assuming arguendo, that there was error, it was harmless beyond a reasonable doubt in view of the overwhelming evidence against appellant.

Affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.

---

**3.** We have previously discussed this problem in the case of *State v. Mitchell*, 140 Ariz. 551, 683 P.2d 750 (App.1984).