[Crim. No. 23082. June 6, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JATURUN SIRIPONGS, Defendant and Appellant.

**COUNSEL**

John P. Ward, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—Defendant Jaturun Siripongs was convicted of murdering Packovan "Pat" Wattanaporn and Quach Nguyen (Pen. Code, § 187), robbery (*id.*, § 211), and burglary (*id.*, § 459). (All further statutory references are to the Penal Code unless otherwise indicated.) The jury found he used a knife (§ 12022, subd. (b)) during the commission of Quach's murder, as well as the robbery and burglary, but did not find that he used a knife when he murdered Pat. It further found true the special circumstances of felony-murder-robbery (§ 190.2, subd. (a)(17)) and multiple murder (§ 190.2, subd. (a)(3)), and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. *The Guilt Phase*

The prosecution's case rested mainly on circumstantial evidence. Accordingly, we set forth the facts in detail:

In December 1981, Surachai "Jack" Wattanaporn operated a wholesale import-export business from a warehouse in Garden Grove, California. He also owned a small retail store in Garden Grove, the Pantai Market. Jack's wife, Pat, managed the store; Quach Nguyen was a store employee. Because Pat also bought and sold expensive jewelry on the side (often while working at the store) she frequently wore several pieces of jewelry to work and kept additional pieces in her purse. Defendant knew this because he had occasionally worked at the store.

Defendant was primarily employed as an optical grinder and polisher working on a 6:30 a.m. to 3 p.m. shift. After work, he usually visited his girlfriend, Sainampeung "Peung" Vecharungspri, who lived in Cerritos. Defendant typically arrived at her house between 4 p.m. and 5 p.m. and stayed until about 9 p.m. During his visit on Monday, December 14, defendant asked Peung's sister, Netnapa (Noon), to telephone his supervisor the following morning and report that he was sick and would not be coming to work. Noon placed the call about 6:30 a.m. the following morning. Defendant did not report for work on December 15 or 16.

About 10 a.m. on December 15, Pat met with Suwat Pansanguan, one of Jack's warehouse employees. Jack had been on a business trip and was scheduled to return that morning. Pat gave Suwat the keys to her car and asked him to meet Jack at the airport. Suwat noticed Pat was wearing a string of pearls, a brooch, a gold pendant, two diamond rings and a gold

Rolex watch. Suwat left the store about 10:30 a.m., and Quach arrived at the store around noon.

At 12:15 p.m., Pat's 13-year-old son, Vitoon, tried to call her from school. He telephoned the market; a woman answered the phone and spoke in a Southeast Asian language. Because the language was not Thai, Vitoon was unable to communicate with the woman. After a few seconds the woman dropped the receiver but did not hang up. Vitoon remained on the line for about two minutes, listening to the sound of cars driving by the Pantai Market and occasionally calling into the phone in the hope of getting a response. He finally hung up. Further attempts to phone the store received only a busy signal.

About 1:30 p.m., Deborah Patton, Suwat's wife, entered the Pantai Market. She had been experiencing car trouble and wished to telephone her husband at the warehouse. When Deborah entered the store she found a woman, standing at the counter holding groceries, who said she had been waiting for at least 30 minutes for a store employee to assist her. Deborah called for Pat but received no answer. She found the telephone receiver lying on the floor near the cash register; she picked it up and called the warehouse.

A search for Pat and Quach ensued. Jack arrived at the store around 2 p.m. with Suwat and telephoned the police while Suwat walked through the store. Suwat entered the dark storeroom in the back of the store. As he tried to turn on the light switch he stepped on something, reached down, felt human hair, and screamed. Thereafter Jack walked into the storeroom and turned on the light.

Blood splatters covered the room. Pat was lying face down on the floor; she had been strangled to death with ligature. Quach was found in a still-wet pool of blood; he had suffered multiple stab wounds to his head and neck, and defensive wounds were found on his hands and right arm. He had been stabbed or slashed at least 10 times; in light of the jagged condition of the skin, the wounds could have been inflicted by a serrated knife. The time of death for both victims was estimated to be 12:30 p.m.

The police arrived shortly after 2:30 p.m. and began investigating. Bloodstains were found everywhere: near the cash register, on the produce scale, in the aisle leading from the storeroom, on two of the storeroom walls, on a water heater and trash can in the storeroom and in the storeroom sink, on the floor leading to the bathroom and in the bathroom sink. Blood samples were taken for analysis.

The police also found a piece of cord tied around Quach's right arm and a piece of paper near Quach's body. The paper was a letter to Noon from one of her friends. (Noon had placed the letter in her jacket, which was one of the items of clothing that she had kept at defendant's house;[1] the last time she had seen the jacket was on Thanksgiving.) Jack informed one of the investigating officers (Detective McLean of the Garden Grove Police Department) that defendant had a criminal record in Thailand and that he might have been responsible for the murders.

Defendant arrived at Peung's house about 3 p.m. the afternoon of the murders, an hour earlier than usual. His fingers were bandaged and bleeding.[2] He claimed he cut himself at work trying to catch a piece of glass, and asked Peung's brother, Wongwej (Deng), to wash the floormats in his car.

Later that afternoon, defendant telephoned his friend Chusit Petsuksomvilai, whom he owed $1,000. He told Chusit that a female friend of his named Sang had been arrested by the immigration authorities and was without money to return to Thailand. Defendant said that Sang needed to leave for Thailand in a week and had given him jewelry which she wished to sell to raise money for the trip. Defendant and Chusit arranged to meet at 6 p.m. that evening, at which time defendant handed Chusit a bag containing nine pieces of jewelry: a gold bracelet, two gold chains, three religious pendants, and three rings, one of which held a two-carat diamond. Defendant asked Chusit to sell the jewelry and estimated that it should bring about $4,000. He also told Chusit that because Sang promised to pay him a commission on any jewelry sold, he would be able to give Chusit some of the money he owed him. All of the jewelry, except for one of the gold chains, was later positively identified as belonging to Pat.

The following morning (Wednesday, December 16) Pat's purse was found in a dumpster behind a shop in Cerritos. The dumpster was a short distance from Peung's house and was located in a shopping complex which housed the laundromat used by defendant. An exhaustive search of the dumpster followed; every item in it was removed and examined.

In addition to Pat's bag, purse and wallet (which still contained eight bank cards), the police discovered Noon's green jacket which had contained the letter found at the Pantai Market; a bloodstained shirt; a pair of bloodstained pants; a pair of bloodstained shoes later found to be defendant's size; a pair of socks; a twelve-and-one-half inch bloodstained Robinson serrated blade kitchen knife with a broken tip; a seven-and-one-half inch Konekut

---

[1] Noon had lived with defendant from late September until early November. She still had clothes at defendant's house during December.

[2] An examination of defendant's hands after his arrest revealed cuts on six fingers.

knife; a wadded bandana containing an adhesive bandage wrapper and a bloodstained paper towel; two pieces of cord, forty-eight inches and forty-nine inches in length; three 9-inch envelopes bearing the name Pantai Market; and a bank deposit slip also from the Pantai Market. The physical dimensions, strand count, color and chemical make-up of the cord found in the dumpster and the cord found wrapped around Quach's right arm were identical. Hair was discovered on the shoes, the shirt, the bandana, and the serrated knife. Some of the hair found was consistent with Pat's hair.[3]

Defendant reported to work Thursday, December 17, at which time he was questioned about the injury to his hands. He told his supervisor that his girlfriend's sister had tried to commit suicide following a fight with her lover and that defendant cut his hands trying to take a knife away from her. Noon contradicted this at trial; when asked specifically whether she had attempted to commit suicide on December 15 or 16, and whether defendant cut his hand while trying to take a knife away from her, she answered, "No."

On the afternoon of the 17th, defendant attempted to make a purchase at a department store using one of the Wattanaporns' credit cards.[4] Because the store's credit card list indicated the card had been lost or stolen, the clerk asked defendant for identification. Defendant looked through his wallet and then told the clerk that his identification was in his car; he left, and did not return.

Later the same afternoon, about 4:30 p.m., defendant attempted to make a purchase at a Sears store with a credit card issued in the name of Surachai Wattanaporn. The clerk telephoned a credit clearing house that maintains credit history and data, including stolen card reports. She was instructed to ask for a driver's license. Defendant told the clerk that he had no identification, and she asked him to wait. The store security manager then spoke with the credit clearing house and was informed that the credit card in question had been stolen the day before, during a double homicide. The security manager, accompanied by two security guards, approached defendant and asked if the card belonged to him. When defendant admitted it did not, they placed defendant under "arrest" for possession of stolen property.

---

[3] The police also found five empty ring boxes; one empty jewelry box; a gold box top to a jewelry box, a small cloth purse for carrying rings; two key rings containing sixteen keys; a piece of paper with numbers written on it as well as some writing in a foreign language; and a department store "courtesy card" made out in the name of Surachai Wattanaporn. A brown vinyl purse was also recovered. The purse contained, among other things, two key rings holding eleven keys, one empty ring purse, and one plastic bag containing a strand of pearls.

[4] On December 16, purchases were illegally made at two stores by a person using one of the Wattanaporns' credit cards.

Defendant was handcuffed and taken to the security office to await arrival of police. En route defendant complained that the handcuffs were too tight. He was informed that the credit card he was using had been taken during a double murder and that the handcuffs would be adjusted once they reached the security office.

Once inside the security office defendant was handcuffed to a chair; because each hand was cuffed separately to the chair, defendant had a fair degree of mobility in his hands. When asked his name and address defendant said his name was "Jay Siri" and that he lived in Costa Mesa.[5] One of the security guards then asked defendant if he had any identification so that he (the guard) could fill out a report for Sears. Defendant reached into his back pocket, removed his wallet, and handed the guard a piece of paper from inside the wallet.

Westminster Police Department Officer Upstill arrived a few minutes later, placed defendant under arrest for possession of a stolen credit card, and replaced the security guard's handcuffs with his own. Upstill asked defendant his name, and its spelling. Defendant responded that his name was written on a card in his wallet and that it would be simpler to copy it from that card; he then reached into his pocket and, with Upstill's assistance, retrieved his wallet. Upstill opened the wallet without objection and flipped through it in search of the card; defendant pointed it out to him when he reached it. Defendant also asked Upstill to remove a gold chain from the wallet and place it around defendant's neck. Upstill found the chain but refused the request, leaving it in defendant's wallet.

About 5:15 p.m., Detective McLean of the Garden Grove police arrived at the store and was told defendant was under arrest for receiving stolen property. He was shown defendant's wallet, the necklace, and some credit cards. Defendant complained of pain in his hands and McLean noticed that his fingers were bandaged.

Before placing him in the police car, Upstill explained to defendant that he would be taken to jail and his car would be left unattended. Upstill told defendant to inform him if he wanted anything removed from his car or if he wanted to make sure the car was locked.

Defendant told Upstill he wished to retrieve his girlfriend's picture from his car. He led the police to his car, and Upstill found a photograph of Peung on the dashboard and placed it with defendant's personal belongings.

---

[5] Defendant once lived in Costa Mesa but was no longer living there at the time of his arrest.

McLean then ordered defendant's car sealed and impounded until a search warrant could be obtained. No search for evidence was made. Defendant was driven to the Westminster police station and Detective McLean followed.

McLean obtained custody of defendant on the murder charges about 6:30 p.m. In addition to defendant's personal property, the Westminster police turned over to McLean the Sears credit card that defendant had attempted to use, defendant's wallet, and the four credit cards found inside it. McLean then drove defendant to the Garden Grove police station, and placed him in an interview room. Blood and hair samples were thereafter taken from defendant.

While being escorted to another room, defendant told McLean he wished to speak to an attorney. McLean thereafter did not question defendant, nor did he advise him of his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

Later that evening, about 11 p.m., defendant was told he would be allowed two telephone calls, and Detective Shave was instructed to tape record the conversations. Shave hid a small tape recorder in the pocket of his sport coat and then escorted defendant to a telephone located in a hallway of the station. Detective Shave asked defendant for the telephone number he wished to call. Shave noted the number, dialed it, and then stood about three feet away from defendant and tape recorded him while he conversed. A television camera was pointed toward the telephone and several police officers were nearby throughout the conversation. Shave could hear defendant's voice clearly, but was unable to understand what was being said because defendant spoke in Thai. When defendant finished, Shave offered to place a second call for him to an attorney or another friend, but defendant declined, stating he could not remember the telephone number of the other person with whom he wished to speak.

It was later learned that defendant had telephoned Peung. He told her he was in jail because he had borrowed someone's credit card. Defendant asked Peung to go to his house and remove some presents, Buddha amulets and a camera. Defendant then asked to speak with Noon. He told her he was in jail because he had borrowed someone's credit card and asked her to go to his house and remove a camera, a Buddha, a sugar jar, Christmas gifts which he had purchased for her family, a document, and his car keys. He told Noon where the objects were located and then instructed her to get money from Chusit. When defendant hung up, Noon and Peung requested their mother's permission to drive to defendant's house. Their mother refused to let them go because it was nearly midnight and very foggy.

The police obtained search warrants for defendant's car and residence shortly before 4 a.m. on the morning of December 18. The warrant for defendant's residence authorized nighttime service. The search of the residence was executed about 5 a.m. Also at that time, Jack and Suwat arrived at the Garden Grove police station to translate the recording made by Detective Shave. During the search, the police discovered several Christmas presents wrapped in department store boxes. A Robinson knife set, consistent with the serrated knife found in the dumpster, was discovered at defendant's residence.

In the midst of the search, the officers were informed that the tape recording of defendant's telephone conversation had been translated, and they were instructed to search specifically for a glass jar on the kitchen stove, a camera case and a Buddha. Those items were seized and found to contain dozens of pieces of jewelry matching Jack's descriptions of Pat's jewelry. Several items—including a gold watch, a jade disk, a green stone, a set of beads, two brooches, three necklaces, three rings, four gold chains, five bracelets, and five pairs of earrings—were later positively identified as belonging to the Wattanaporns.

In a box in defendant's bedroom, the police discovered eight department store receipts for some of the Christmas gifts. The receipts bore Pat's name, and were dated after her death. A piece of paper on which someone had practiced signing Pat's name was also found.

The search warrant for defendant's car was executed later that morning. Several samples of dried blood were collected. The police found a bag containing Pantai Market bank books, credit card receipts, and a gold watch that belonged to Pat.

Later that afternoon, defendant telephoned Chusit from jail. He told Chusit he had been arrested for using a credit card and that he had been charged with the Pantai Market murders. Chusit asked defendant whether the jewelry purportedly belonging to Sang had been stolen, and defendant assured him it was not. Chusit then asked defendant how he should return the jewelry to Sang. Defendant instructed him to contact Noon because she knew Sang and could contact her. Immediately thereafter, Chusit telephoned Noon, and asked how he could reach Sang. Noon replied that she did not know anyone named Sang.

Analysis of defendant's blood sample revealed that several of the bloodstains found at the murder scene, and bloodstains on four of the items of clothing found in the dumpster, were consistent with defendant's blood type. The bloodstains on the pieces of cord from the dumpster—which

matched the cord tied around Quach's arm—were also consistent with defendant's blood. The bloodstains on the shoes found in the dumpster were consistent with Quach's blood.

The defense presented no evidence at trial, choosing instead to challenge the sufficiency of the People's evidence. During closing argument, defense counsel stressed that there was no direct evidence placing defendant at the murder scene. He insisted that the People's case was based on mere suspicion, and argued that suspicion, no matter how strong, did not rise to "proof beyond a reasonable doubt." He contended there was no motive for defendant to kill Pat and Quach, and he reminded the jury of the testimony that defendant was once a Buddhist monk in Thailand and that he had a history of nonviolence.

The jury deliberated for one day, and returned the verdicts described above. Additionally, it specially found that defendant "intentionally killed" both Quach and Pat.

## B. *The Penalty Phase*

The People presented no further evidence at the penalty trial. The defense argued that defendant was a competent and cooperative employee who had a "good" and "caring" attitude about his job; that he was once the victim of an armed robbery and that he had been "helpful [and] very cooperative" during the police investigation of that crime; that he was a "good inmate" and, in the words of a cellmate, a "model prisoner" who did not cause trouble and who volunteered for work assignments; and that he was a religious man. The jury deliberated for one day before returning a verdict of death.

## II. GUILT PHASE ISSUES

## A. *The Tape Recording*

Defendant asserts the tape recording of his telephone conversation following his arrest constituted an unlawful wiretap, in violation of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520), and violated his right to counsel and his privilege against self-incrimination.

### 1. Illegal Wiretap

Defendant insists it was illegal for Officer Shave secretly to record his telephone conversation "in the absence of a valid court order." We question whether this claim is properly before us because, although

defendant raised it in his motion for new trial, it was not presented to the trial court at the suppression hearing. (Evid. Code, § 353.)

In any event, we reject defendant's claim on its merits. First, Officer Shave did not "intercept" the conversation "through the use of any electronic, mechanical, or other device," as prohibited by 18 United States Code section 2510(4). Rather, he heard the conversation with his normal hearing faculties and the tape recording merely memorialized what he heard. Accordingly, no interception of a wire communication occurred. (See *United States* v. *Carroll* (D.C. 1971) 332 F.Supp. 1299, 1301 ["[T]he overhearing and recording of one end of a telephone conversation without the actual interception of a communication passing through the wires, was not intended to be included within the definition of the term 'wire communication' but under the statute is simply another form of oral communication]."

Nor did the recording constitute an unlawful interception of an oral communication because, on these facts, defendant had no reasonable expectation of privacy. (Cf. *People* v. *Suttle* (1979) 90 Cal.App.3d 572 [153 Cal.Rptr. 409].) The federal wiretap law prohibits only interception of communications "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." (18 U.S.C. § 2510(2).) Defendant could not have justifiably expected his conversation was not being intercepted, because he could clearly see that at least one police officer could hear every word he said. As we explain below, he had no reasonable expectation the officer could not understand Thai, or that his speech was not being recorded by that officer for later translation.

2. Right to Counsel

■ Defendant's right to counsel claim is similarly meritless. Because adversary proceedings had not yet been formally initiated against him, his right to counsel under the federal Constitution had not attached at the time of the telephone call. (See *Kirby* v. *Illinois* (1972) 406 U.S. 682, 688-689 [32 L.Ed.2d 411, 416-418, 92 S.Ct. 1877]; *People* v. *Bustamante* (1981) 30 Cal.3d 88, 95 [177 Cal.Rptr. 576, 634 P.2d 927]; *United States* v. *Gouveia* (1984) 467 U.S. 180, 187-188 [81 L.Ed.2d 146, 153-154, 104 S.Ct. 2292].) Nor was this a "critical stage" of the proceedings sufficient to trigger his right to counsel under our state Constitution. (*Bustamante, supra,* 30 Cal.3d at p. 99; see *People* v. *Houston* (1986) 42 Cal.3d 595, 609, 610, fn. 15 [230 Cal.Rptr. 141, 724 P.2d 1166].) Defendant was offered the opportunity to place a telephone call in part so that, if he wished, he could contact an attorney. He cites no authority to suggest that such a situation amounts to a

"critical stage" which triggers his right to counsel under the state Constitution. It would be unreasonable to hold that such an event amounts to a critical stage of the proceedings, and it would be anomalous to hold a defendant may not place such a call without waiving counsel's presence or having an attorney present.

### 3. Self-incrimination

■ Defendant claims the tape recording violated his right against self-incrimination. His statements, however, were not the result of custodial interrogation or its equivalent. Defendant was not questioned by the police; he was simply allowed to make a telephone call.

Defendant also asserts Officer Shave illegally "eavesdropped" on his conversation. As noted above, however, Shave was standing in plain view near defendant, and could obviously overhear defendant's side of the conversation. By speaking in Thai, defendant showed he realized Shave could hear what he said, but hoped that the officer could not understand Thai. By tape recording the conversation, Shave accomplished nothing more than would have been achieved by stationing an officer fluent in Thai at the telephone.

A similar situation arose in *People* v. *Bazaure* (1965) 235 Cal.App.2d 21, 34 [44 Cal.Rptr. 831], in which two defendants suspected of murder held a conversation in Spanish, unaware that nearby officers were fluent in that language. In rejecting a claimed violation of their right to privacy, the Court of Appeal held: "Neither [defendant] nor any of the other parties were induced to talk. Possibly feeling a false sense of security because they spoke in a foreign tongue, the two defendants talked freely and attempted to concoct a story. No element of trickery by the officers was involved. Defendants sought to trick the officers. . . . The officers did not set out to outwit defendants. Defendants outsmarted themselves. When the officers listened to the conversations no right of privacy was invaded." (235 Cal.App.2d at p. 34.) As the court held here, defendant was not reasonably entitled to believe that the officer could not also understand Thai.

### 4. Use of the Telephone Number

Defendant also asserts the police were not entitled to obtain and use the telephone number that defendant called. Because defendant failed to raise this objection below, the claim is not properly before us. " '[T]he general rule [is] that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v.

*Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178].)[6]

In any event, defendant's claim is meritless because public safety concerns justified the police conduct here. ■ A defendant might use his telephone call to instruct another to kill or threaten a witness, to destroy evidence, or to otherwise hamper a police investigation. In view of these considerations, the police may require a defendant first to disclose the telephone number of the person to whom the call is being placed, and may then place the call and (consistently with § 851.5, subd. (b)(1)), overtly listen to the defendant's side of any non-attorney-client conversation without invading his right to privacy and without implicating his privilege against self-incrimination.

### B. *Seizure of Defendant's Wallet*

As noted above, when Officer Upstill arrived at the Sears store, he asked defendant for his name, and its spelling. Defendant replied there was a card in his wallet which bore his name and that it would be simpler if Upstill copied it from that card. Defendant then tried to extract his wallet from his back pocket. By this time, however, defendant's hands had been handcuffed together behind his back, making it difficult for him to remove his wallet.

Upstill helped remove the wallet, and opened it in front of defendant. Defendant did not object. Upstill then flipped through the cards, looking for the one that bore defendant's name. He noticed various department store cards, all bearing the name Wattanaporn and a bank card in the name of an unknown third person. When Upstill reached the card bearing defendant's name, defendant pointed it out to him. Upstill then kept the wallet.

■ Defendant moved to suppress the wallet and the credit cards discovered therein, claiming the seizure of his wallet constituted an unlawful search incident to arrest and that, even assuming defendant had consented to the search, Upstill exceeded the scope of the consent. The People asserted there was no search, but if there was a search it was consensual, and that in any event the contents of the wallet would have been inevitably discovered in the course of a booking search of defendant. The court found defendant had consented to Officer Upstill's act.

"Our role in reviewing the resolution of this issue is limited. The question of the voluntariness of the consent is to be determined in the first instance

---

[6]We reject as meritless defendant's claim that the telephone number constituted a confession or an admission.

by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (*People* v. *James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].)

Contrary to defendant's claim, substantial evidence does support the court's finding. The record shows Upstill simply followed defendant's suggestion that he copy defendant's name from a card contained in his wallet. At no time did defendant object to Upstill's act; on the contrary, defendant pointed out the card for Upstill when he got to it. If defendant did not intend Upstill to look through his wallet he had ample opportunity to make that known. We believe the record sufficiently supports the court's finding.

We also believe Upstill stayed within the scope of defendant's consent. The record discloses that Upstill came across the cards bearing the name Wattanaporn before he reached the card bearing defendant's name. It would be anomalous to find that, had Upstill opened the wallet and found the card with defendant's name first, the search would have been within the scope of consent, but that because Upstill first noticed cards bearing the name Wattanaporn, the search exceeded the scope of the consent. The officer was not required to close his eyes to this evidence.

In any event, the contents of the wallet would inevitably have been discovered. The booking search performed by the Garden Grove Police Department would have included defendant's wallet had Upstill not previously itemized its contents. Defendant observes that accelerated booking searches are no longer allowed. (See *People* v. *Laiwa* (1983) 34 Cal.3d 711, 728 [195 Cal.Rptr. 503, 669 P.2d 1278].) At the time of the search here, however, they were permissible. (See *People* v. *Longwill* (1975) 14 Cal.3d 943, 948 [123 Cal.Rptr. 297, 538 P.2d 753, overruled in *Laiwa*.)

Finally, even assuming the evidence should have been suppressed, any error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In light of the other incriminating evidence in this case, the absence of the evidence that defendant was carrying three additional credit cards with him bearing the Wattanaporn name would not have affected the jury's verdict.

C. *Discovery of the Car*

As noted above, Upstill discovered the existence and location of defendant's car by informing him that, if he wished to lock his vehicle or

take anything out of it, he should make the request before he was transported to the police station. Defendant directed Upstill to his car and, on defendant's request, Upstill retrieved a photograph from it. The vehicle was impounded and later searched pursuant to a warrant. The search uncovered a gold watch identified as belonging to Pat, sales slips bearing the name Wattanaporn, and dried blood.

Defendant argued below that Upstill's remark was designed to elicit an incriminating response and thus violated his right to remain silent. The People insisted that no interrogation took place, and claimed Upstill was "merely providing [defendant] a chance to secure his automobile and any valuables which might be contained therein." The court concluded defendant voluntarily revealed the location of his car to the police by requesting that a photograph be retrieved from it. In so ruling, the court explained that it "specifically [found] the officer's conduct was not a subterfuge designed to elicit statements from the defendant and further [found] the defendant's statements [were] freely, voluntarily and spontaneously made."

We see no reason to disagree with the court's determination. First, the record discloses that Upstill did not know defendant owned a car, but that he made the statement to defendant only because it was his policy to extend this offer to anyone arrested in a shopping mall.

In addition, Upstill's statement warned defendant of a legitimate concern: Defendant's car, if he had one, would be left unattended for some time, and if the car was unlocked, or if it contained items of value which defendant did not want exposed to the risk of theft, defendant should make his request before he was booked at the police station and it became more difficult to locate and secure the car. We therefore conclude the court did not err in admitting the evidence discovered during the search of defendant's car.

### D. Drawing of the Blood Sample

▇ The blood sample drawn from defendant was found to be consistent with six of the blood stains discovered at the murder scene. Defendant claims the sample was drawn in violation of his Fourth Amendment right to be free from unreasonable search and seizure. The People assert the sample was drawn and analyzed for the presence of drugs or alcohol in the event defendant made any statements, and that it was unnecessary that a warrant first be obtained before the sample was taken.

▇ In *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123], we held, "[a] warrantless invasion of the body must be incident to a valid arrest [citation] and may occur only under a limited range of exigent

circumstances. These circumstances include the need to prevent loss or destruction of evidence, or the existence of a medical emergency. [Citations.]" (*Id.*, at pp. 291-292.) Although "blood tests for alcohol, performed under medical conditions, have been consistently upheld as routine, minor, and highly reliable" (*id.*, at p. 292), the decision to draw a blood sample "must be founded on a 'clear indication' that such evidence will be found." (*Ibid.*)

▆▆ Here, the purported justification for the invasion of defendant's body was to test for the existence of drugs or alcohol *in light of the possibility that defendant might make some statements.* The police observed no indication that defendant was under the influence of drugs or alcohol, nor did they have reason to suspect he might decide to talk. We therefore disagree with the trial court's finding that the blood was lawfully drawn. Nonetheless, we find the error harmless.

At the time the blood was drawn, defendant was the prime suspect in the Pantai Market double murder. A blood sample would inevitably have been drawn and would have disclosed the identical information used against him at trial. As the People observe, even had the court ruled the blood sample unlawfully drawn, it could have later ordered a new blood sample to be drawn. Defendant is thus unable to demonstrate prejudice; the blood sample would have provided the same information whether drawn at the station or after the suppression hearing. Hence, the court's error in finding the blood lawfully drawn was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].)

E. *Authorization for Nighttime Service*

When the police sought search warrants for defendant's residence and vehicle, they also requested authorization for nighttime service. Detective McLean telephoned an Orange County Superior Court judge about 3:15 a.m. to obtain the warrant and informed him: "I request that nighttime service of this warrant be granted. The stolen property is easily transported and/or sold. [Defendant] was allowed to make the one phone call he requested. He made that call to a location in Cerritos. He spoke to the answering party in Thai only. I believe he did this to prevent us from overhearing instructions to dispose of whatever contraband or evidence is still in his residence." The judge authorized nighttime service for the residence but not for the vehicle. The warrant for the residence was executed around 5 a.m.

▆▆ Defendant attacks the nighttime service authorization on two grounds. First, he claims McLean purposely omitted material facts when he

failed to inform the judge that defendant's residence was under police surveillance and that police observed no movement within the house. Second, he claims his conversation in Thai was insufficient to support McLean's belief that he was attempting to dispose of the stolen property. We find both contentions meritless.

First, we reject the premise that the omissions were "material." We have held that "facts are 'material' and hence must be disclosed if their omission would make the affidavit *substantially misleading*." (*People* v. *Kurland* (1980) 28 Cal.3d 376, 385 [168 Cal.Rptr. 667, 618 P.2d 213], italics in original.) The failure to inform the judge that the residence was under police surveillance did not render McLean's information substantially misleading. Nor do we find it substantially misleading that McLean failed to inform the judge that no movement within the residence had been observed: The fact that the officers could not *see* any movement did not mean that in fact no one was inside. The police were not required to wait until their fears were realized before seeking authorization for nighttime service. We therefore believe the omissions did not render the affidavit substantially misleading and that the judge would not have refused nighttime authorization had he known these additional facts.

Second, we find McLean's belief that defendant was attempting to dispose of incriminating evidence to be a reasonable and logical inference from defendant's conduct. Whether the judge should have authorized nighttime service on the basis of this belief is a question left to his sound discretion. (§ 1533.) Under the facts here, we do not find he abused that discretion.

We therefore agree with the court's finding that the information given the judge provided a sufficient basis for authorizing nighttime service. Accordingly, we find no error in the admission of the evidence seized from defendant's residence.

## F. *Juror Misconduct*

Six days after the jury returned its guilt verdict, defense counsel brought to the court's attention a matter of "potential juror misconduct." The information provided was sketchy. An attorney had contacted defense counsel and informed him that one of his clients, a Mrs. Meyers, had called to tell him that her daughter was a juror in the Siripongs case and that her daughter wanted to know what it meant when the defense rested. Defense counsel informed the court that he had not yet investigated, but that he suspected Juror Pitts was the juror in question. Counsel also told the court, "I'm in no position at this time to make a motion for mistrial." He

requested that inquiry be made of the suspected juror to determine the nature of any contact concerning the case.

The court replied that it did not want to interview the wrong person. It asked defense counsel whether the attorney would be available to appear before the court on February 22; counsel said yes. The court indicated that Juror Pitts would be questioned after the attorney convinced the court his information concerned both the correct case and the correct juror.

On February 22, the attorney failed to appear. Defense counsel then suggested "that an in camera hearing take place between the court and [Juror] Pitts to determine whether or not any misconduct of any kind has occurred and to determine the nature of the communication . . . [between] [Juror] Pitts and Mrs. Meyers. [¶] The proceedings we ask for, I think, are of a commonsense nature. They certainly would under most circumstances reveal whether or not a communication took place that involved this trial." In addition, defendant requested a continuance until he could secure the missing attorney's presence. The People agreed that "[o]ut of caution," an inquiry should take place. The court then ruled that it would conduct a hearing outside the presence of counsel and the jury, as requested, but it denied defendant's motion for a continuance, without prejudice to a second motion if the facts warranted a continuance. No objection was made to the court's stated in camera procedure.

At the in camera hearing, Juror Pitts revealed that she had asked her mother, "What happens when the [defense counsel's] table is cleared off?"—an apparent reference to the defense resting its case. The juror's mother relayed the question to her own lawyer, and he eventually responded that it probably meant the case was almost finished. The juror's mother then relayed that message to Juror Pitts. When questioned further, the juror maintained the exchange had not influenced her determination of defendant's guilt or innocence, and she promised to strictly abide by the court's admonitions for the rest of the trial.

■ Defendant now complains that the in camera hearing was inadequate. He claims the procedure violated his rights to due process and to be present at all critical stages of trial, as well as his right to assistance of counsel. He insists that on these facts, Juror Pitts committed "misconduct" amounting to reversible error, and that he should have been allowed to question her.

The short answer to these procedural claims is that defendant got what he asked for—an in camera hearing "between the court and [Juror] Pitts"— and hence he waived any objection to the procedure used. We also note that

an identical procedure was used, with apparent approval, in a similar situation in *People* v. *Woods* (1950) 35 Cal.2d 504, 511-512 [218 P.2d 981].

Nor can we agree with defendant's assertions of procedural error. Defendant cites nothing to convince us that the in camera procedure violated his due process rights, nor does he convince us that the court abused its discretion in denying his motion for a continuance on the facts before it.

We have recently reiterated the general rule that "the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and '[t]he burden is upon the defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial.' [Citations.]" (*People* v. *Hovey* (1988) 44 Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776].) Although defendant insists his presence might have served "as a vivid and perceptible reminder to juror Pitts that [defendant's] life and liberty depended upon the deliberations of twelve impartial jurors, basing their verdicts on the evidence alone," he fails to recognize that the central issues were whether the juror communicated with her mother and, if so, whether the communication constituted misconduct. As explained below, both of these questions were adequately addressed and resolved by the court. The in camera hearing did not impair defendant's ability to "defend the charges against him"; nor did his absence render the trial unfair.

Nor does defendant persuade us that the procedure employed violated his right to assistance of counsel. As the People concede, the general rule forbids ex parte communications between a court and jurors. This rule protects, among other things, a defendant's right to counsel. (E.g., *People* v. *Garcia* (1984) 160 Cal.App.3d 82, 88 [206 Cal.Rptr. 468].) That purpose, however, does not appear to be implicated here. Defendant, through his counsel, suggested and authorized the communication, and even set the agenda for the proceeding. Furthermore, the inquiry was reported and transcripts were provided to the defense. Had defendant been disturbed about the nature and scope of the meeting he could have objected in a motion for a new trial. His failure to do so suggests this authorized communication between the juror and the court was consistent with counsel's expectations, and certainly not prejudicial. We therefore reject defendant's claim that the procedure used violated his right to the assistance of counsel.

Finally, even assuming that any of defendant's procedural claims has merit, or assuming the court erred in concluding the juror's action did not amount to "misconduct," we perceive no prejudicial error. The transcript of the in camera hearing discloses that the juror asked her mother only what it meant when defense counsel's table is "clean" or "cleared off."

The answer given through the juror's mother's attorney was that the case was probably almost completed. The communication dealt with nothing substantive and, as the juror stated to the court, did not affect her decision on the verdict. At most, it merely confirmed her belief that the trial was almost at an end. (Cf. *People* v. *Woods, supra,* 35 Cal.2d 504, 511-512 [in camera discussion between judge and juror concerning definition of a hung jury could not have prejudiced defendant and therefore did not require reversal]; *Rushen* v. *Spain* (1983) 464 U.S. 114, 121 [78 L.Ed.2d 267, 275, 104 S.Ct. 453] [ex parte communication between judge and juror concerning association with a violent crime and with the Black Panthers "was innocuous" and therefore did not affect juror's impartiality].) Thus, any error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 711]; *Rushen, supra,* 464 U.S. at pp. 117-121 [78 L.Ed.2d at pp. 272-275].)

## G. *Playing of the Tape Recording*

Before the close of their case-in-chief, the People sought to admit the tape recording made of defendant's telephone conversation, as well as a translated transcript of the recording. They proposed to admit the tape to convey to the jury the commanding tone of defendant's voice, and wished to admit the transcript to establish that defendant requested Peung and Noon to remove incriminating evidence from his house.

Defendant objected to admission of the tape, claiming it contained too many pauses, deletions, and gaps to make "the content of the tape as a whole" admissible. He urged the court to find that, in light of the gaps and unintelligible section, the probative value of the tape was outweighed by its prejudicial effect and therefore should be excluded under Evidence Code section 352.[7]

The court was provided with two transcripts of the tape: one translated by the court interpreter and one translated by defendant's interpreter. There were insignificant differences between the two transcripts. Both interpretations clearly established that defendant was instructing his listeners to go to his house immediately and retrieve the sugar jar on the stove, the camera case, something from a Buddha, the Christmas gifts and the sales receipts

---

[7] Defendant claims for the first time on appeal that there is no "showing that voice tones in the Thai language convey similar emotional affects to voice tones in English," and hence the tape could not show that defendant spoke in a commanding voice. This assertion, however, was not raised below and is therefore not properly before us. In any event, those who listened to the tape—the court, the prosecutor, and the defense attorney—apparently did not share appellate counsel's concern. We see no reason to speculate that the tape did not, in fact, demonstrate what the prosecution proposed.

from the box in his bedroom. He also instructed them to find the keys to his car and retrieve his car, and to get some money from Chusit.

The court ruled the tape admissible, stating: "The court finds that the conversation that the defendant conducted on the phone is highly relevant and indeed a valuable piece of evidence for the prosecution because it's obvious from the transcript [both the one prepared by the court interpreter and the one prepared by defendant's interpreter], that the defendant was, in fact, attempting to conceal fruits of his crime and the means he used to [commit] the crime."

A finding as to admissibility of evidence under Evidence Code section 352 is left to the sound discretion of the trial court and will not be disturbed unless it manifestly constituted an abuse of discretion. (*People* v. *Hall* (1980) 112 Cal.App.3d 123, 127 [169 Cal.Rptr. 149].) As defendant concedes, a tape recording may be admissible even if substantial portions of it are unintelligible. (*Id.*, at p. 126.) Here, in spite of unintelligible portions, the tape clearly demonstrated defendant's efforts to remove incriminating evidence from his home. Comprehensive transcripts of the tape manifesting his attempt to destroy relevant evidence were made by both interpreters. Under these facts, we cannot find an abuse of discretion in admitting the tape recording.

Nor do we share defendant's concern that the unintelligible portions of the tape left the jury to speculate that the tapes contained "further evidence of culpability." The portions of the tape that were understandable established defendant's attempt to have *every* incriminating piece of evidence removed from his residence. We decline to indulge in speculation as to what "further evidence of culpability" the jury could have possibly imagined.

## H. *Admission of Defendant's Statements to Officer Upstill*

After Upstill obtained from defendant's wallet the card bearing defendant's name, the officer began an inventory of the wallet's contents. He sat in a chair next to defendant, placed a notebook on his lap, and went through the five credit cards.[8] He explained, "as I was taking the cards I was writing them down so I could inventory them [and] later I could put them [in my] . . . report . . . ." When Upstill reached a First Interstate Bank card bearing the name Behrooz Nikkou, defendant spontaneously denied he had stolen the card, and claimed it had come in the mail.

---

[8] Defendant's claim that this constituted an unreasonable search and seizure is addressed, *ante*, at pages 566-567.

Defense counsel sought to exclude this statement on the ground that it was obtained in violation of defendant's right to remain silent. The court, however, "specifically [found] the officer's conduct was not a subterfuge designed to elicit statements from the defendant and further [found] the defendant's statements [were] freely, voluntarily and spontaneously made."

Defendant renews his contention on appeal. He views Upstill's conduct as "[a] tactic of confronting [defendant] with evidence against him" and claims, "the only possible purpose in showing [defendant] the card with someone else's name on it was to see if he would respond." There is nothing in the record to support defendant's interpretation of the events. Indeed, the record indicates that Upstill did not show defendant the credit cards as he was conducting his inventory.

" '[T]he trial court's ruling on a *Miranda* [v. *Arizona, supra*, 384 U.S. 436] issue may not be set aside by us unless it is *"palpably erroneous."* A ruling palpably erroneous is one lacking support of substantial evidence.' " (*In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549], italics added in *Eric J.*) We believe the record demonstrates that Upstill's conduct was neither a custodial interrogation nor its functional equivalent, and that defendant's statement was voluntary. The record supports the trial court's ruling.

In any event, any error was clearly harmless. (*Chapman, supra*, 386 U.S. at p. 24.) As set out above, there was ample additional evidence, apart from his brief statement to Upstill, proving defendant had murdered Pat and Quach and stolen Pat's jewelry and credit cards.

I. *References to Defendant's Failure to Testify*

Defendant asserts the prosecutor improperly commented on his failure to testify. We have examined the record, especially the three pages cited by counsel, and have found no improper comment. Accordingly, we find the claim meritless.

### III. SPECIAL CIRCUMSTANCES ISSUES

Defendant makes two related claims of error. First, he asserts that by instructing the jury pursuant to a modified version of CALJIC No. 2.50 on the "other crimes" evidence presented during the guilt trial, the jury was somehow "misdirected . . . on the crucial issues of intent to kill." Second, he claims that, despite its express special finding on that point, the jury did not actually find he intentionally killed Pat and Quach.

Defendant's premise—that a jury finding of intent to kill was required in this case (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862])—is no longer valid. As we explained in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [240 Cal.Rptr. 585, 742 P.2d 1306], intervening decisions of the United States Supreme Court led us to reconsider and overrule *Carlos*. Therefore, even assuming, as defendant insists, the jury was for some reason misdirected on its "intent to kill" inquiry, the special circumstance findings are not thereby affected.

## IV. PENALTY PHASE ISSUES

### A. *Defendant's Criminal Record From Thailand*

■■■ Defendant claims the court erred in refusing to make a preliminary ruling excluding evidence concerning his criminal record in Thailand. He maintains, "the trial court ruled that if [defendant] called his mother and some of his close friends as witnesses in mitigation *and if the testimony of these witnesses was not restricted to the issue of whether or not [defendant] had a propensity for violence,* then the court would not 'unduly restrict' the prosecution from asking witnesses if they were aware that [defendant] had been convicted of a felony [in Thailand]." (Italics added.) Defendant asserts this perceived limitation on his right to present evidence without impeachment resulted in his counsel's decision not to call to the stand some of his planned witnesses in mitigation. As a consequence, defendant claims, he suffered prejudicial error. Our review of the record reveals that defendant has mischaracterized the court's ruling, and that in any event no error occurred.

The People informed the court that they had evidence of two prior "robbery" convictions that defendant suffered in Thailand (one of which resulted in a two-and-one-half year prison term), and that they wished to use this information to cross-examine defense witnesses.[9] The foundation for the People's information was a certified copy of defendant's Thai "rap sheet." Defense counsel requested a preliminary ruling on the admissibility of the priors. The court postponed ruling on the issue until the court interpreter confirmed that the Thai convictions involved force or violence.

At the next hearing, the People informed the court that Bangkok police had authenticated the rap sheet as belonging to defendant. The literal translation of the offenses defendant committed read, in pertinent part, "an offense involving dishonesty, the taking away of the property of another person or persons." Because the definition did not contain the element of

---

[9] The evidence was never offered (nor was it admitted in any form) for purposes of establishing an "aggravating factor" under section 190.3, factor (b) or (c).

force or fear, the court refused to allow the prosecution to inquire into defendant's Thai convictions to rebut testimony that defendant was not violent.

At the same time, however, the court refused to give a preliminary ruling as to whether the People would be allowed to inquire into the convictions if the defense introduced evidence of defendant's honesty and veracity.[10] Defense counsel, still unsatisfied, summed up his request as follows: "I want the testimony of my witnesses . . . not to be attacked or to be circumvented by the prosecution's asking of questions relating to the character of [defendant] as to past misconduct or evidence of misdeeds." The court reiterated, "The court fails to, or chooses not to, give you a preliminary ruling until I hear the evidence. I've already given you one commitment that the court feels is in accordance with the law; I've precluded the prosecution from going into the area of force and violence. *That's as far as the court will go on the issue.*" (Italics added.)

Thus, contrary to defendant's assertion, the court did not restrict the testimony of defendant's witnesses to his propensity for nonviolence but instead restricted the *prosecution* from inquiring into defendant's criminal record to show defendant was violent. The court simply refused to rule blindly on whether it would permit the prosecution to inquire of defendant's witnesses, "Have you heard that defendant has suffered a conviction for a crime involving dishonesty?" without first knowing the extent of the evidence brought out on direct examination.

---

[10] Thereafter defense counsel explained, "I anticipate that we will not be discussing the aspects of truth and veracity. However, we will be examining into areas such as [defendant's] *religious commitment and concern, the fact that he does practice the Buddhist faith.* Is the court then going to interpret the fact that these .". . religious beliefs are a character trait for truth and veracity?"

The court responded, "I don't know enough about the Buddhist religion to be able to make a determination at this point whether that will open the door or not. In the event there is an explanation of what the tenets of Buddhism are, and among those tenets it's explained to the jury that there is a devout appreciation for the aspect of honesty, that if one of the teachings and one of the things that all Buddhists follow are issues of truth and veracity, if that comes into evidence, then you risk the possibility of the court considering the inquiry [into defendant's convictions involving dishonesty]. [¶] Now I want to make the record absolutely and perfectly clear, because it appears that you have some feeling that I have a desire or intent in my ruling . . . to restrict your examination of your witnesses, and that is absolutely not true. You have total, unfettered discretion with absolutely no restrictions by this court on whatever testimony you wish to elicit from all of your witnesses. . . . The only thing that the court has endeavored to do is give you a preliminary ruling, which I have done. The People are precluded from using the inquiry of the prior charges which appear to the court's mind at this point to be theft as opposed to a true robbery. They appear to be somewhat lacking in element factor with the necessary aspects of violence and force and fear so that [they] would properly and lawfully allow the People to impeach a witness that has a character appreciation of the defendant's lack of those categories of conduct. *That is the only issue that the court will restrict the prosecution on at this point, for the reason I have no idea how far you will go in your examination.*" (Italics added.)

We find no error in the court's ruling. Moreover, even assuming the ruling could be seen as tantamount to a preliminary determination to allow impeachment limited to the issue of truthfulness or veracity, we perceive no error. ■ It is well established that, "[w]hen a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony." (*People v. Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) So long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually took place, they may so inquire. (*Ibid.*) Clearly the authenticated rap sheet formed a sufficient basis to support such a good faith belief.

■ We also reject defendant's claim that cross-examination under Evidence Code section 1102 is impermissible at the penalty phase whenever character testimony is introduced in mitigation rather than to show conformity with a particular character trait. A defendant has no right to mislead the jury through one-sided character testimony during either the guilt or penalty trial. We do not believe that defendant was entitled to elicit testimony suggesting that he was honest, and at the same time to preclude the People from introducing contrary evidence. Defendant provides us with no authority for his position.

Defendant also asserts he should have been allowed to introduce testimony to the effect that he was "a devout Buddhist and a good son" without fearing inquiry into his Thai convictions. Defendant was in no way prohibited or restricted from introducing evidence that he was a "good son." As long as he did not introduce testimony showing that one of the characteristics of a "devout Buddhist" was truth or honesty, he was free to introduce this evidence as well without fear of impeachment by the Thai priors.

We also fail to see how defendant was prejudiced. As noted, defendant's mother could have testified that defendant was a "good son" without opening the door to inquiry into his Thai convictions, unless she further stated that he was truthful or honest. Moreover, defendant *did* introduce evidence that he was "a devout Buddhist." During the guilt phase, defendant elicited from prosecution witnesses that he had been a Buddhist monk in Thailand and that he continued to pray to Buddha every day. Defense counsel reminded the jury of these facts during closing argument at the penalty trial.

B. *Alleged Prosecutorial Misconduct*

During the penalty trial, defendant moved for a mistrial on the basis of alleged prosecutorial intimidation of defense witnesses. He sought to call a

witness to support the claim. The court requested an offer of proof, and defense counsel told the court that defendant's girlfriend's father would testify that during a recent discussion in the hallway, "the District Attorney may have stated to the [defense] witnesses, that is, Bea and Noon, that they know more than they are telling," and that this was "an implied threat to the two witnesses . . . ." The court responded that it "believe[d] they know more than they are telling, too, . . ." and denied both the motion to call the witness and the motion for a mistrial.

■ We agree with the court that the statement, "you know more than you are telling" does not constitute intimidation. The cases finding prosecutorial intimidation uniformly contain actual threats; here, there was no threat. Moreover, such assumed misconduct does not warrant reversal unless the defendant has shown prejudice. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) Here, there is no evidence that the witnesses refused to testify. In fact, immediately after the court denied this motion for mistrial, defense counsel asked to be allowed to put on Noon and Bea free from possible cross-examination concerning defendant's misdeeds and past conduct. It was only when the court denied this second motion, discussed *ante,* pages 576-579, that defense counsel opted not to present further testimony. We therefore fail to see any possible prejudice resulting from the prosecutor's statement to the witnesses.

### C. *The Prosecutor's Reference to the Victims' Families*

During closing argument, the prosecutor stated: "Now you saw the wife of the deceased Vietnamese man, and you heard her testify and you heard her talk about her family. In considering circumstances of the crime, I don't think we have to be blinded by the impact of these types of horrendous offenses on those who are left behind. It is not just the enormity of taking one's life that is involved, but it is the impact that is left on those who survive, the near and dear. And I think that is a factor that certainly at least you might give some thought to, both as far as the Wattanaporn family is concerned and as far as the Quach family is concerned. [¶] Victims have rights to be recognized and to be listened to and to be addressed by jurors, and jurors must have the courage, if the evidence warrants it, to impose a death penalty if that's what the law is and that's what the evidence directs. And we are satisfied that in our system that concept does prevail. [¶] The circumstances of this crime are enormously aggravating . . . ."

■ At this point defendant moved for a mistrial, claiming the prosecution was "appealing to the prejudices and the biases of this jury by making mention of the families." The court denied the motion, but instructed the prosecutor not to refer to the families further.

We recently reviewed this issue in *People* v. *Ghent* (1987) 43 Cal.3d 739 [239 Cal.Rptr. 82, 739 P.2d 1250], in which the prosecutor made a very similar argument to the jury. We noted that the United States Supreme Court has held formal *evidence* on the impact of a crime on the victim's family to be inadmissible and improper (*Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-452, 107 S.Ct. 2529, 2532-2536]), but that mere *argument, without instructions* on that subject, may not be prohibited by *Booth*. (43 Cal.3d at p. 771; see also *People* v. *Miranda* (1987) 44 Cal.3d 57, 112-113 [241 Cal.Rptr. 594, 744 P.2d 1127] [*Booth* is "patently distinguishable"].)

Here, as in *Ghent* and *Miranda,* we believe *Booth* is distinguishable. The prosecutor's comments were "brief and mild"; no evidence was introduced by the prosecution, or highlighted at closing argument, to substantiate the impact of the crimes on the victims' families; and the jury was not instructed to consider the impact of the crimes on the victims' families in reaching its penalty decision. We perceive no prejudicial error.

D. *Instructions on Mitigating Evidence (former CALJIC No. 8.84.1) and Sentencing Discretion (former CALJIC No. 8.84.2)*

1. Former CALJIC No. 8.84.1—Factor (k)

The jury was instructed in the terms of former CALJIC No. 8.84.1, factor (k) on the scope of defendant's mitigating evidence. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) As we have held in *People* v. *Brown* (1985) 40 Cal.3d 512, 544 [220 Cal.Rptr. 637, 709 P.2d 440], footnote 17, we will review all pre-*Easley* cases to determine whether, on the basis of the whole record, the jury was adequately informed of its duty to consider all of the defendant's relevant mitigating evidence, whether or not it related to the capital offense. Having done so here, we conclude there was no "factor (k)" error.

First, the prosecutor said nothing to suggest the jury's consideration of defendant's mitigating evidence was improperly limited by the former instruction. To the contrary, he told the jury to consider "all" of the evidence—including defendant's penalty phase evidence of "nonviolence"—"for what it is and give it the weight which you think it is due."

Defense counsel argued similarly. He told the jury it was to view defendant as "a [whole] person, to consider his background and capabilities, and the contributions he might be able to make to society if allowed to live," and that "these are matters that you may consider as a mitigating factor."

Finally, the court's instructions reinforced this message. The court told the jury it could "consider pity, sympathy, and mercy for the defendant in deciding the appropriate penalty." It further instructed, "[the] testimony showing defendant's present capabilities and his good conduct . . . are matters that you may consider as a mitigating factor" and "you should not limit your consideration of mitigating circumstances to the specific factors[.] You may also consider any other circumstances relating to the case or to the defendant, . . . as reasons for not imposing the death sentence."

Viewing the record as a whole, we find the jury was adequately instructed and that no factor (k) error occurred.[11]

### 2. Former CALJIC No. 8.84.2—*Brown*

■ The jury was also instructed in the unadorned language of former CALJIC No. 8.84.2. As we explained in *People* v. *Brown, supra*, 40 Cal.3d 512, 536-544, and *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115], this instruction might under certain circumstances tend to mislead a reasonable jury into believing (i) its sentencing responsibility is to be discharged by a mere "counting" of aggravating and mitigating factors, or (ii) that it was permitted to arrive at its sentencing decision without having to exercise its moral discretion and decide whether death is the *appropriate* penalty for this offense and offender. (*Allen, supra*, 42 Cal.3d at pp. 1276-1277.)

Neither counsel misled the jury on the first aspect of *Brown, supra*, 40 Cal.3d 512. The prosecutor told the jury, "[y]ou don't count up the number of aggravating or mitigating factors; the weight that you give to a particular factor is your own determination, you know, how important or how much weight a particular factor is entitled to. And it is the ultimate weighing process that we are concerned with." Similarly, defense counsel told the

---

[11] In a related argument, defendant claims the court erred in refusing to delete the assertedly "inapplicable" mitigating factors from CALJIC No. 8.84.1. We have rejected this claim in *People* v. *Ghent, supra*, 43 Cal.3d 739, 776-777 (1977 law), and *People* v. *Miranda, supra*, 44 Cal.3d 57, 104-105 (1978 law).

Similarly, defendant asserts the court erred in denying his request to instruct that his murder conviction "was not in and of.itself an aggravating circumstance" under CALJIC No. 8.84.1, factor (a). Factor (a) provides that the jury may consider "the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." The jury was not instructed that it could consider the crime itself in determining the sentence. We agree that the jury could not impose the death penalty simply because defendant had committed a murder. The trial court, however, properly instructed the jury in the language of CALJIC No. 8.84.1, which does not authorize the jury to consider the bare *fact* that defendant has suffered a murder conviction, but instead the *circumstances* surrounding it. We therefore fail to see, and decline to speculate on, how the jury could have been misled.

jury to weigh, not count, and that any one "mitigating factor standing alone is sufficient to support a decision that life without possibility of parole is the preferred and appropriate punishment in this case." Finally, the court illuminated the weighing process by twice instructing, "[a]ny [mitigating factor] may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case." Further, the court instructed, "[i]t is the combined weight of the aggravating circumstances, measured against the combined weight of the mitigating circumstances which is determinative. You are not to merely count up the number of circumstances on either side."

As to the second consideration, we note the prosecutor told the jury its job was to decide "which of two penalties *should* be imposed." (Italics added.) He stated, "you are called upon to make that determination [i.e., whether "the appropriate penalty is death"] by weighing the factors of aggravation and mitigation as you see them to exist, based on the evidence in the case" and "[y]ou are to use discretion in making such an important and ultimate decision." Finally, he told the jury it would be asked to "make a finding as to which you deem the appropriate penalty to be[,] based on the evidence," and concluded by stating, "[i]f the aggravating factors outweigh the mitigating factors, *you're asked* to return a verdict of death." (Italics added.)

Defense counsel's comments followed this approach. For example, he emphasized that each individual juror was personally responsible for the jury's decision, and that it was up to the jury, and the jury alone, to make the "important and ultimate decision" about whether defendant should live or die.

Finally, the court's special instructions echoed this proper theme. In addition to the above-quoted instructions, the jury was told to consider defendant's sympathetic and mitigating evidence "in deciding the appropriate penalty." The court also instructed: "You are not to consider only what a person may deserve to receive as a punishment, because it can be argued that anyone who is responsible for another's death may be said to deserve to die. Rather, you are to use discretion in making such an important and ultimate decision."

On this record, we cannot imagine that a reasonable jury would have been misled about its moral discretion and sole responsibility to decide whether death is appropriate in this case.

E. *Argument Contrary to Davenport*

 Defendant claims that at one point in his argument the prosecutor asserted that the fact that defendant was *not* an accomplice to the crime, but

was instead the principal actor, constituted an aggravating factor. Addressing sentencing factor (j) (§ 190.3, factor (j)), the prosecutor said, "his participation in the commission of this offense was not relatively minor at all. Clearly a factor of enormous aggravation based on the evidence." As we explained in *People* v. *Davenport* (1985) 41 Cal.3d 247, 289, 290 [221 Cal.Rptr. 794, 710 P.2d 861], the absence of a mitigating factor may not be considered as an aggravating factor.

Reversal is not warranted, however. The prosecutor's comment was brief, and referred to only one of the various factors. Moreover, in context, the prosecutor's argument might reasonably have been interpreted as merely emphasizing the nonexistence of a mitigating factor, and as returning the jury's attention to factor (a) (§ 190.3, factor (a)), the circumstances of the crime. In any event, we note that defense counsel responded in his argument that the absence of a mitigating factor was a neutral consideration which did not amount to aggravation. In addition, the court delivered the standard instruction telling the jury to consider the various factors only "if applicable," and as noted above, the record shows the jury was not misled about its consideration of mitigating evidence and its exercise of sentencing discretion. On these facts, we conclude there is no reasonable possibility the prosecutor's argument affected the jury's sentencing discretion.

F. *"Double Counting" of Former Section 190.3, factors (a) and (b)*

In *People* v. *Kimble* (1988) 44 Cal.3d 480, 504-506 [244 Cal.Rptr. 148, 749 P.2d 803], we held the jury should not be told that the "circumstances of the present crime" can be considered as aggravating factors under both factors (a) (which establishes as a sentencing factor "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found true . . .") *and* (b) (which establishes as a sentencing factor "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence"). (§ 190.3, factors (a), (b).)

Here, the prosecutor did not tell the jury to consider the circumstances of the capital crime under both factors (a) *and* (b). ▮▮▮ Defendant, however, suggests the court had a sua sponte duty to tell the jury that it should not, on its own, consider the facts of the present crime as aggravating factors under both factors. We cannot agree such an instruction was required; in the absence of misleading prosecutorial argument to the contrary, and in view of the instruction as a whole, we believe a reasonable jury would have interpreted factor (b) as encompassing only violent criminal activity

*other* than the capital offense. (*Miranda, supra,* 44 Cal.3d 57, 105-106.) Accordingly, we find no error.

### G. *"Spillover" Effect From Asserted Guilt Phase Errors*

Defendant repeats his claim that various evidentiary errors occurred at the guilt phase, and alleges such "errors," even if deemed harmless at the guilt phase, require reversal of the penalty judgment. As we have explained above, however, for the most part we discern no such error. In any event, in view of the character of the properly admitted evidence tending toward aggravation, we cannot agree that the asserted erroneously introduced evidence—inter alia, the tape recording showing the "cold manner" of defendant's speech, and the dried blood found in defendant's car—improperly prejudiced the jury's sentencing determination.

### H. *Constitutional Attack*

Defendant claims it was unconstitutional for the jury to fix his sentence at death without first finding "beyond a reasonable doubt that aggravating circumstances outweighed mitigating circumstances and that death was the appropriate penalty." We have previously rejected this argument. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-778 [230 Cal.Rptr. 667, 726 P.2d 113].) Similarly, we have also rejected his claim that the statute itself (§ 190 et seq.) is unconstitutional. (*Id.,* at pp. 777-779.)

In a related claim, defendant urges he was entitled to an instruction that any fact underlying an aggravating circumstance must be proved beyond a reasonable doubt before the jury may consider it. A defendant is entitled to a reasonable doubt instruction "only when evidence of other crimes is introduced or referred to as an aggravating factor pursuant to former Penal Code section 190.3, subdivision (b)." (*People* v. *Robertson* (1982) 33 Cal.3d 21, 60 [188 Cal.Rptr. 77, 655 P.2d 279] [conc. opn. by Broussard, J.]; see also *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 790-792.) Here, no such evidence was introduced.

### I. *Comparative Sentence Review*

Defendant claims he is entitled to "comparative sentence review" under the state Constitution. As we have explained in *Allen, supra,* 42 Cal.3d at

page 1285, and *Rodriguez, supra*, 42 Cal.3d at pages 777-779, the claim is meritless.

Defendant also suggests his sentence cannot stand under *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697], and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921]. As we explained in *Allen, supra*, 42 Cal.3d 1222, "there [is no] merit in any assertion that the punishment prescribed for the offense in question [here, burglary-robbery-double murder] is more severe than that prescribed for less serious crimes, or that the death penalty for defendant's crime is disproportionate to the punishment prescribed for the same offense in other jurisdictions." (*Id*. at p. 1286.) Nor, in light of the facts of this case (set out *ante*, pp. 556-563), can defendant credibly assert the punishment imposed is disproportionate to his individual culpability.

J. *Statutory Modification Ruling Under Section 190.4, Subdivision (e)*

Defendant claims the court committed two errors in its section 190.4, subdivision (e), ruling. First, he asserts the court held an erroneously narrow view of the scope of mitigating evidence under "factor (k)." (§ 190.3, factor (k).) The record, however, does not support this claim. Although the court did state, "there are no circumstances which extenuate the gravity of the crime, even though it not be deemed a legal excuse . . . ," it is clear from the record that the court did fully *consider* all of defendant's penalty phase evidence. The court recounted each witness's testimony (e.g., defendant was cooperative at work and at the jail, and had been a cooperative witness for the police in a prior criminal proceeding), and concluded each piece of testimony was "mitigating, but of minimal value . . . ," or "of very minimal mitigating value."

Second, defendant asserts the court committed error under *Davenport, supra*, 41 Cal.3d at pages 289-290, by treating the absence of evidence showing statutory mitigating factors as aggravating factors. Our review of the record, however, reveals that the court merely commented that various presumably mitigating factors were not proved by the evidence. It did not, as did the prosecutor in *Davenport*, expressly treat the absence of a mitigating factor as an aggravating factor. ▮▮▮▮▮ We discern no error.[12]

---

[12] Although defendant does not raise the point, the record reveals that the court, immediately *after* its denial of the statutory modification motion, asked, "is there any legal cause why sentence should not now be pronounced?" The prosecutor informed the court that the victims relatives were in the courtroom, and that they had a "right" to make a statement.

### K. *Alleged Error at the In Camera Hearing*

Defendant's final contention is that error occurred at a February 17, 1983, ex parte in camera hearing, attended by only defendant, his attorney and the trial judge. Defendant does not tell us what error occurred, nor does he explain why he believes the error was prejudicial. In any event, we have read the transcript of that hearing and fail to find either error or prejudice.

### L. *Enmund Finding*

In view of this record, we believe the jury's guilt phase verdicts imply a finding that defendant actually killed, or that he intended to kill, his two victims. After reviewing the record, we conclude this implied finding is amply supported and adopt it as our own, thus satisfying the requirement of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368] (see *Cabana* v. *Bullock* (1986) 474 U.S. 376, 390-391 [88 L.Ed.2d 704, 719-720, 106 S.Ct. 689, 699-700]).

### CONCLUSION

The judgment is affirmed in its entirety.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

MOSK, J.—I concur in the judgment, but must comment on one questionable aspect of the opinion that may cause prosecutors in future cases to err.

---

Thereafter two relatives delivered brief statements in which they expressed their grief, and asked the court to sentence defendant to death. The court listened to the statements, and told the second witness, "the court is about to commit the defendant to the death sentence . . . ." The court then did so.

We discern no reversible error under *Booth* v. *Maryland, supra,* 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. *Booth* emphasizes the potential prejudicial effect of such evidence on a *jury*; it seems doubtful that the court's analysis was intended to apply to trial judges, who are presumably capable of retaining objectivity despite exposure to such materials. In any event, on the face of the record it appears that the relatives' statements did not in any way affect the court's statutory modification ruling; indeed, the court had denied the motion before it learned there were relatives present to make statements. Nor does it appear the court might have noticed some "legal cause why sentence should not now be pronounced" in the absence of the two statements.

In his closing penalty argument, the prosecutor discussed the "impact that is left on those who survive, the near and dear. And I think *that is a factor* that certainly at least *you might give some thought to.*" (Italics added.) This was error: impact on survivors is not one of the enumerated factors in Penal Code section 190.3.

Referring to *People* v. *Ghent* (1987) 43 Cal.3d 739 [239 Cal.Rptr. 82, 739 P.2d 1250], the majority attempt to draw a distinction between evidence describing the effect on the surviving family and mere argument on the subject. While in *Ghent* there was argument and no testimony, this court did not indicate its approval. Indeed, the majority referred to "the *prejudicial effect* of the prosecutor's comments" (*id.* p. 772, italics added), but found it "minimal or nonexistent." (Accord, *People* v. *Miranda* (1987) 44 Cal.3d 57, 113 [241 Cal.Rptr. 594, 744 P.2d 1127].) There is, of course, a significant difference between affirmative approval of a proceeding and finding it to be error but nonprejudicial.

As I discussed in my concurring opinion in *People* v. *Hovey* (1988) 44 Cal.3d 543, 586 [244 Cal.Rptr. 121, 749 P.2d 776], the Supreme Court case of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], is the latest word on the subject of injecting surviving family concerns in a criminal case. While there was evidence admitted in *Booth* concerning the devastating effect on family, Justice Powell's opinion for the court was not limited to the impropriety of evidence as distinguished from argument. He declared: "We thus reject the contention that the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics, are proper sentencing considerations in a capital case." (*Id.* at p. 507 [96 L.Ed.2d 451, 107 S.Ct. at p. 2535].) He continued by warning that the "*presentation of this information by the State* can serve no other purpose than *to inflame the jury* and divert it from deciding the case on relevant evidence concerning the crime and the defendant." (Italics added.) (*Id.* at p. 508 [96 L.Ed.2d at p. 452, 107 S.Ct. at p. 2536].) He did not distinguish between the state's presentation by means of evidence or argument. Obviously the purpose would be identical: "to inflame the jury."

California preceded *Booth* with *People* v. *Levitt* (1984) 156 Cal.App.3d 500, 516 [203 Cal.Rptr. 276], in which the court emphasized that the bereavement of the victim's family could not be considered by the sentencing agency. If consideration is improper, a fortiori argument on the subject is improper.

In my concurring opinion in *Hovey,* I expressed the hope that counsel in future cases will be guided by *Booth* and *Levitt* and will avoid presentation of such extraneous matters by either testimony or argument. I trust the majority opinion will not be seen as diluting that warning.

**BROUSSARD, J.**—I concur in the judgment and join in the views expressed by Justice Mosk in his concurring opinion.

Appellant's petition for a rehearing was denied July 28, 1988.