Filed 5/21/15  P. v. Desarno CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CORY ALEXANDER DESARNO,<br><br>    Defendant and Appellant. | D065395<br><br><br><br>(Super. Ct. No. SCE325294,<br> SCE325442) |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel B. Goldstein, Judge.  Affirmed.

Sarah Kleven McGann, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Cory Desarno appeals from a judgment convicting him of several assault-related offenses committed during two distinct incidents.  For one of the incidents, the jury

verdict included a true finding that he committed the offenses for the benefit of a gang (the Lakeside Gangsters, a white supremacy gang). He contends the judgment must be reversed based on the trial court's ruling that if he presented character evidence showing his friendships with African-Americans and Hispanics, the prosecution could present rebuttal character evidence showing he had been convicted of a hate crime against an Asian individual. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

According to the prosecution's evidence, defendant is a member of the white supremacy gang Lakeside Gangsters. Defendant's convictions in this case arose from two incidents in which defendant and several other males engaged in assaultive conduct, one incident on August 26, 2012 and the other on October 21, 2012.

*The August 26 Incident*

Around midnight on August 26, 2012, Kyle Wilson was with a group of friends (the victim group) in a taco shop parking lot when he was assaulted during an altercation with a group of males, including defendant. Defendant was identified as the person who assaulted Wilson. Wilson did not remember much of the incident, and at trial the assault was described primarily by his friends, including Christopher Petrille, Summer Lewis, Dylan Schmoke, and several others.

A group of about five or six males (the assailant group) walked by the victim group calling them names like " 'pussies' " and " 'fags.' " Words were exchanged, and one of the males in the assailant group (later identified as Cory Holman) punched one of the males in the victim group (Petrille) in the face. Others in the assailant group were trying

2

to get Holman to stop; Petrille was able to push Holman away; and the assailant group started walking away. As they walked away, the assailant group continued to call the victim group names, including "pussies" and " 'rich boys.' " When Petrille sarcastically responded, " 'Yeah, because we have a lot of money,' " Holman came running back and tried to punch Petrille, and the two began fighting.

Two or three of the males in the assailant group were holding out "box cutter knives" to provide "cover," meaning if anyone tried to help Petrille the males with the box cutters would assault them. Victim Wilson started approaching the two fighting males. One of the other males (later identified as Robert Miller) held out his box cutter and told Wilson to " 'Let them handle it' " and " 'Stay back.' " Wilson put his hands out and said " 'We don't want to fight.' " However, when Wilson started to "lean over" towards Petrille, another male in the assailant group (later identified as defendant) ran across the parking lot towards Wilson and hit him from behind.

It appeared that defendant had something in his hand, like a "fist-packer" that "adds more weight to your fist in a punch." Wilson was knocked unconscious; he "[f]ell straight to the ground on his face" with a "loud . . . impact"; and he was bleeding extensively. People in the victim group were yelling " 'Call the cops,' " and the assailant group ran away. The victim group called 911; the authorities arrived; and Wilson was transported to the hospital.

Petrille identified defendant as part of the assailant group; Lewis identified defendant as the male who ran up to Wilson just before he fell to the ground; and

3

Schmoke testified defendant looked like Wilson's assailant although he was not "completely sure."

Wilson's jaw was broken in three places; several teeth were damaged or permanently lost; he was in the hospital for about nine days; his jaw was wired shut for about six and one-half weeks; and at the time of trial his ability to fully open his mouth was still impaired.

*The October 21 Incident*

Around 1:00 a.m. on October 21, 2012, Curren Facer (Curren) escorted a friend to her car after visiting at Curren's father's apartment. A group of about 15 people (the assailant group) was walking down the street at the same time. As Curren was returning to his father's apartment, he passed the group and then was suddenly hit in the back of his head with a "pretty hard blow." Curren turned around and asked, " 'What's going on?' " About eight males from the assailant group were "circling around" him. The male who hit him said, " 'You don't know me. I'm Cory D.' " At trial, Curren identified defendant as the person who said this.

Curren told the group he did not want to fight them and he was just trying to get home. The group started swinging at Curren, who was trying to dodge the punches. Defendant then pulled out a knife and tried to stab Curren while another male held Curren's arms back. Meanwhile, Curren's friend (Spencer Nielson), who also had been escorting friends to their car, came running to try to help Curren. People in the assailant group started attacking Nielsen. Curren, meanwhile, was able to break free without

4

getting stabbed, and he ran to his father's apartment. During the altercation, Curren's shirt was ripped off and he sustained multiple scratches and bruises.

Three of the assailants followed Curren to the front door, and Curren yelled for his father. When Curren's father, Roger Facer (Roger), came outside, the three assailants started running back to the street. Roger followed the assailants to the driveway area of the apartment complex. Nielson also arrived at the driveway area, appearing "pretty beat up." Roger yelled at the group " 'What the fuck?' " and " 'Why does it take 15 guys to jump two guys?' " One of the males in the assailant group (a "Skinhead with tattoos") responded, " 'Hey, man, this is Lakeside. This is what we do.' " While this was occurring, Curren saw defendant come up behind his father. Curren yelled to his father that there was "a guy with a knife." When Roger turned around, defendant swung at him with the knife a couple of times, but Roger was able to avoid the knife. There was a lot of "cussing back and forth," and males in the assailant group said to Roger " 'You're a dead man' " and " 'Hey, we know where you live now.' " When someone yelled that the police were on their way, the assailant group scattered and ran away.

Curren identified defendant as the person with the knife. Roger was about "95 percent" sure defendant was the person with the knife.

*Gang Evidence*

The prosecution's gang expert (Detective Ellen Vest) testified that the Lakeside Gangsters is a criminal street gang with a "white supremacy ideology." Referencing persons involved in the August 26 assault, Vest testified that Miller and defendant were members of the Lakeside Gangsters, and Holman was an associate of the gang.

5

Defendant had various gang-related tattoos; during a police contact he was found in possession of several items marked with gang references; and he was depicted in group photos making the gang's L-shaped hand sign. Detective Vest opined that during the August 26 incident, Holman was "putting in work" for the gang to show his loyalty and ability to fight for his gang so he could become a member. Further, Vest testified the commission of crimes by gang members as a group advances the gang's reputation by showing they are "tough guys" who control the area.

*Defense*

Testifying on behalf of the defense, several witnesses (including defendant's mother, brother, girlfriend, and others) stated that at the time of the August 26 incident defendant was at his brother's home, and at the time of the October 21 incident he was fishing.

*Jury Verdict and Sentence*

For the August 26 incident involving victim Wilson, the jury convicted defendant of battery with serious bodily injury and assault by means of force likely to cause great bodily injury, with true findings that he personally inflicted great bodily injury and acted for the benefit of a gang. For the October 21 incident involving victims Curren and Roger, the jury convicted him of two counts of assault with a deadly weapon, with true findings that he personally used a deadly weapon (a knife). Defendant admitted that he had served a prior prison term.

The court sentenced defendant to a nine-year prison term.

6

DISCUSSION

Defendant argues the court abused its discretion and deprived him of a fair trial by ruling the prosecution could present evidence of his prior hate crime conviction involving an Asian victim to rebut proffered defense evidence that he had friendships with African-Americans and Hispanics.

*Background*

When questioned by defense counsel, prosecution gang expert Vest testified that white supremacy gangs like the Lakeside Gangsters generally do not "hang out" with people of other races, including African-Americans and Hispanics, and it would be unusual for them to "make it a habit to hang out with blacks and Hispanics." When asked if there was an ideological reason why they would not commonly associate with other races, Vest explained their ideology was based on "World War II pure blood . . . . Not mixing with races." Defense counsel queried further, "So would you say that this white power ideology also extends to hatred of other races," and Vest responded, "Yes."

Thereafter, defense counsel proffered testimony from two of defendant's friends, an African-American and a Hispanic, who would testify they have known defendant "forever and he's a great guy, hangs out with people of all different races." The prosecutor told the court that he would rebut evidence that defendant was "a person who is racially harmonious" by evidence of defendant's prior conviction for battery against an Asian that included a hate-crime finding because defendant "singled [the victim] out because of his race." Objecting to the proffered rebuttal evidence, defense counsel stated that on cross-examination of the gang expert he specifically referred to the gang's lack of

7

association with African-Americans or Hispanics; he did not ask about any other specific racial groups; and his proffered good character evidence did not concern Asians.

The court rejected defense counsel's contention, stating defense evidence that defendant had no acrimony towards other racial or ethnic groups—whether it be Hispanics, African-Americans, or another group—would allow the prosecutor to present rebuttal evidence showing defendant attacked someone because of the person's race.[1] Accordingly, the court ruled if defendant presented evidence of defendant's harmonious relationship with other races, the prosecutor could rebut it with evidence of the hate crime. Defendant subsequently did not present his proffered good character evidence.

*Governing Law*

The prosecution is generally prohibited from presenting evidence of a defendant's bad character to prove the defendant acted in conformity with that character in committing the charged offense. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357; Evid. Code, § 1101, subd. (a).) In contrast, a defendant may present opinion or reputation evidence to show the defendant's character is inconsistent with a character trait associated with the charged offense, and hence the defendant did not likely commit the

---

[1] During the discussion, the prosecutor stated he had subpoenaed the Asian victim of the hate crime, and if defendant presented evidence showing he was a racially harmonious person, the prosecutor would move to call the Asian victim "to testify what [defendant] did to him." Later during the discussion, when defense counsel asked "how far" the court "would . . . let [the prosecutor] go with" the evidence, the court stated it was "not going to answer hypotheticals about [the prosecutor] doing whatever he is going to do," but at this juncture would just make its admissibility ruling.

offense.  (*Tuggles*, at p. 357; *People v. Wagner* (1975) 13 Cal.3d 612, 617; *People v. Honig* (1996) 48 Cal.App.4th 289, 348-349; Evid. Code, § 1102, subd. (a).)

When a defendant presents good character evidence, the prosecutor may then present opinion or reputation evidence of the defendant's bad character to rebut the defendant's evidence and show a likelihood of guilt.  (*People v. Tuggles, supra*, 179 Cal.App.4th at p. 357; *People v. Siripongs* (1988) 45 Cal.3d 548, 578 ["A defendant has no right to mislead the jury through one-sided character testimony . . . ."]; Evid. Code, § 1102, subd. (b).)[2]  Also, the prosecutor may test the reliability of the good character testimony by inquiring on cross-examination whether the witness has heard of specific instances of the defendant's misconduct that are inconsistent with the claimed good character trait.  (*People v. Wagner, supra*, 13 Cal.3d at p. 619; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1528; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 954.) Thus, the defendant's decision to "call character witnesses to testify to his reputation respecting the relevant character trait involved in the offense charged . . . exposes himself to the calculated risk of having the witnesses subjected on cross-examination to questions respecting reports . . . of his conduct inconsistent with his reputation as testified to by the witnesses."  (*People v. Kramer* (1968) 259 Cal.App.2d 452, 466.)

---

[2]    Concerning the admissibility of character evidence, Evidence Code section 1102 states:  "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:  [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character.  [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."

9

However, the scope of the prosecutor's rebuttal with bad character evidence is not unlimited. (*People v. Tuggles, supra*, 179 Cal.App.4th at p. 357.) The prosecutor may not introduce " '*any and all* "bad character" evidence the prosecution can dredge up.' " (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1193.) Rather, the scope of rebuttal must be specific, and the rebuttal must be directly related to the particular character trait offered by the defendant in his behalf. (*Ibid.*) On appeal, we review the trial court's ruling concerning the admission of rebuttal evidence for abuse of discretion. (*People v. Raley* (1992) 2 Cal.4th 870, 912.)

*Analysis*

Defendant contends the court's ruling was erroneous because his proffered character evidence did not address whether he had positive relationships with all other races or Asians specifically; the prosecution's proposed rebuttal evidence concerning Asians did not rebut his proposed character evidence concerning African-Americans and Hispanics; and the fact that a person may be prejudiced against one racial group (i.e., Asians) does not mean the person is prejudiced against another racial group.

The contention fails. The prosecution's gang expert testified that members of white supremacy gangs like Lakeside Gangsters do not normally associate with other racial groups because it is against their ideology and they have a hatred of other races. Defendant's proffered testimony from an African-American friend and a Hispanic friend who would testify that he associated with "people of all different races" was relevant to support that he was not a Lakeside Gangster member because he associated with different racial or ethnic groups. To rebut the defense evidence that defendant associated with all

10

races and hence was not a member of a gang that espoused racial hatred, the prosecutor was entitled to present character evidence based on defendant's previous commission of a racially-motivated hate crime.

Contrary to defendant's assertion, the proposed defense character evidence did not solely concern defendant's relationships with African-Americans and Hispanics. The expert's testimony on cross-examination referred broadly to the gang's lack of association with "people of other races" and its "hatred of other races," and defense counsel proffered testimony that defendant "hangs out with people of all different races."

Further, the fact that the proffered defense character evidence did not expressly refer to Asians did not mean that evidence concerning Asians was irrelevant. The relevant issue was whether defendant was a member of a gang that as a matter of ideology did not associate with and harbored animosity towards other racial or ethnic groups, and defendant sought to dispute his membership in this gang by showing that he did associate with other racial or ethnic groups. As stated, the latter character evidence permitted rebuttal character evidence based on his demonstrated animosity towards a member of a different racial group. (See *People v. Wagner, supra*, 13 Cal.3d at p. 617 ["A defendant cannot bar the prosecution from rebutting favorable character evidence merely by characterizing the direct examination as being narrower in scope than in fact it was."].)[3]

_____

[3]     We note that, generally, a prosecutor may cross-examine a defense good character witness regarding the defendant's prior conviction, but may not present independent evidence of the conviction. (*People v. Felix* (1999) 70 Cal.App.4th 426, 431-433; see

11

The court did not err in ruling the prosecution's proffered rebuttal character evidence could be presented to the jury.

DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.

---

*People v. Wagner, supra*, 13 Cal.3d at p. 619.) Assuming this limitation applies here, it was not discussed in the proceedings before the trial court (see fn. 1, *ante*), nor has it been raised by defendant on appeal. In any event, cross-examination of the defense character witnesses concerning the prior hate crime conviction—although more limited than independent evidence of the conviction—would have placed the hate crime information before the jury. There is nothing to suggest an express ruling by the court on this point would have altered defense counsel's decision not to present the good character witnesses.